Debtor will assume the following unexpired leases:

Master Lease with Ryder Truck Rental, Inc. d/b/a Ryder Transportation Services – lease assumed, but number of vehicles leased will vary from time to time

Master Lease with Star Leasing Co. - lease assumed, but number of vehicles leased will vary from time to time

# EXHIBIT "H"



# TRUCK LEASE and SERVICE AGREEMENT

This Agreement is dated as of 16th Day of June, 2014 by and between **RYDER TRUCK RENTAL, INC. d/b/a RYDER TRANSPORTATION SERVICES**, whose address is 11690 N.W. 105th Street, Miami, FL 33178 ("Ryder") and **MONSEY ONE INC.**, whose address is 18 Pulaski St., Bayonne, NJ 07105 ("You/Yours").

## 1. EQUIPMENT COVERED AND TERM.

**A. Agreement and Schedule A(s).** Ryder agrees to lease to you and you agree to lease from Ryder the vehicles listed on Schedule A(s) (the "Vehicle(s)"). Each Schedule A is a part of this Agreement and contains additional terms and conditions. When you sign a Schedule A, you authorize Ryder to obtain the Vehicle(s) and you agree to take delivery of each. Failure to take delivery of a Vehicle for any reason is a material breach of this Agreement.

**B. Lease Term.** The lease term for each Vehicle begins when Ryder tenders that Vehicle to you and lasts for the period specified on its Schedule A unless the lease term is terminated earlier as permitted herein. If you operate any Vehicle after its lease term has ended, the terms of this Agreement will apply to the hold over lease, but either party shall have the right to terminate the hold-over lease upon 30 days prior written notice to the other party.

**C. Vehicle Specifications, Alterations, and Equipment.** When you place a Vehicle in service, you acknowledge that it conforms to the Vehicle specifications and is in good working order. You agree not to alter the structure of any Vehicle without Ryder's written consent. You agree to pay for all structural alterations, special equipment, and all changes in painting, lettering, and art work that you make or request Ryder to make after you sign the Schedule A. If a law or regulation changes, after you sign a Schedule A, that requires Ryder to install new or additional equipment on the Vehicle or to otherwise alter the Vehicle, Ryder will perform the installation or alteration at your expense. If you use a Vehicle while it is connected to a trailer or other equipment that Ryder does not lease to you or maintain for you, you agree to keep that trailer and equipment in good operating condition.

## 2. SERVICES THAT RYDER PROVIDES.

**A. Maintenance and Repairs to Vehicles.** For each Vehicle, Ryder will provide lubricants, tires, tubes, and all other operating supplies, perform all maintenance and repairs, and supply all labor and parts required to keep the Vehicle in service.

*(1) Maintenance and Repair Schedule.* You agree to return each Vehicle to Ryder at the maintenance facility listed on Schedule A (the "Maintenance Facility") for at least 8 hours per month for preventive maintenance at mutually agreeable times. You agree to notify Ryder immediately when any repairs are necessary and return the Vehicle to the Maintenance Facility for performance of those repairs.

*(2) Repairs Performed by Third Parties.* Only Ryder and parties expressly authorized by Ryder may repair, maintain, or adjust a Vehicle. You agree not to have a third party repair or make adjustments to a Vehicle, without Ryder's consent. Ryder will only pay for properly authorized and documented repairs.

**B. Substitute Vehicles.** Except as described in this Paragraph 2B, if a mechanical failure renders a Vehicle temporarily inoperable, Ryder agrees to supply you with a vehicle, as nearly as practicable the same size as the inoperable Vehicle, (a "Substitute Vehicle"), at no extra cost except for mileage, fuel, and other variable charges. Ryder agrees to provide the Substitute Vehicle where the Vehicle was disabled and you agree to return it to the facility that provided it. All Substitute Vehicles will be governed by the terms of this Agreement. Ryder will not furnish a Substitute Vehicle for any Vehicle that is out of service: (i) for preventive maintenance ; (ii) due to driver abuse; (iii) for repair of Physical Damage resulting from any cause, including fire, collision, upset, vandalism or an Act of God; (iv) due to your violation of this Agreement; or (v) for repair or maintenance of special equipment that Ryder is not responsible for maintaining. Ryder will not furnish a Substitute Vehicle for any Vehicle that is lost or stolen or for any specialized Vehicle.

**C. Emergency Road Service.** Ryder agrees to provide road service for mechanical or tire failure (unless it results from an accident, driver abuse or a violation of this Agreement). Where Ryder is not responsible for road service, Ryder will coordinate road service for you at your expense.

**D. Safety Program.** At your request, Ryder will provide you with its then-current standard safety program.

**E. Additional Services.** Ryder will provide additional services as listed on Schedule A.

**F. Additional Repairs.** Regardless of any other provision of this Agreement, you agree to pay for all damage, repairs, maintenance, and related expenses resulting from your operation of a Vehicle in violation of this Agreement. Any such repairs or maintenance performed by Ryder and all Vehicle washes in excess of the amount on Schedule A shall be at Ryder's retail sales and service rates (including overtime).

## 3. FUEL.
When Ryder is designated on Schedule A, Ryder will provide fuel for each Vehicle from a Ryder or Ryder-designated facility. Ryder's charge for fuel it provides will vary over time. Fuel charges are incidental and are billed in addition to all other lease charges. If your account is past due, Ryder may elect to stop providing fuel to you. You will be responsible for the cost of fuel you obtain from other sources and cannot charge these costs to your Ryder account.

## 4. VEHICLE OPERATING CREDENTIALS AND TAXES.

**A. Licensing and Taxes.** Where it is legal to do so, Ryder will apply and pay for the following (up to the allowance for each item on Schedule A): (i) state motor vehicle license and registration in the state of domicile (for the licensed weight shown on Schedule A); (ii) personal property taxes (in the state of domicile); and (iii) Federal Heavy Vehicle Use Taxes. You agree to provide Ryder with all documentation required for vehicle licensing (including trip records) on a weekly basis. If you fail to provide Ryder with timely and accurate

information, you agree to reimburse Ryder for any resulting charges, penalties, or expenses. You will pay to Ryder all charges incurred by Ryder in states other than the state of domicile for any of the items listed in Paragraph 4. Also, Ryder shall have the right upon 30 days prior notice, to stop applying for vehicle licenses and to remove any existing vehicle licenses issued to Ryder.

**B. Fuel Tax.** When designated on a Schedule A, and where it is legal to do so, Ryder will: (i) apply and pay for (up to the allowance on Schedule A for fuel tax permits) IFTA fuel tax permits and highway use/mileage tax permits for each Vehicle; (ii) prepare and file IFTA fuel tax and highway use/mileage tax returns; and (iii) pay fuel taxes and highway use/mileage taxes imposed on the operation of the Vehicles, on the following terms:

*(1) Required Documentation.* You must provide Ryder with all necessary documentation (including trip records and fuel tickets) on a weekly basis. If you fail to provide Ryder with timely, accurate and complete information, you agree to: (i) reimburse Ryder for any charges, penalties, expenses, or disallowed credits; (ii) pay Ryder an amount equal to the estimated taxes computed on a per mile basis and (iii) pay Ryder a surcharge of $.20 for each mile that you fail to properly report. In addition, Ryder shall have the right, upon 30 days notice, to stop providing the services described in this Paragraph 4B and you shall be responsible for these obligations as if you were designated on Schedule A to provide them.

*(2) Reimbursement of Fuel, Highway Use and Mileage Taxes.* You will reimburse Ryder for all fuel, highway use and mileage taxes paid by Ryder on your behalf, including, but not limited to, all additional fuel taxes resulting from your consumption of fuel in a state other than the state in which the fuel was purchased and all taxes that may become due based on the documents you provide.

*(3) If you provide IFTA fuel tax reporting.* You agree to defend, release, indemnify, and hold Ryder harmless for all Damages and Defense Costs resulting from your failure to properly obtain IFTA fuel or highway use/mileage tax permits, file IFTA fuel or highway use/mileage tax returns or pay IFTA fuel or highway use/mileage taxes.

**C. Allowances.** If the cost of any of the items listed in Paragraphs 4A and 4B exceeds the annual allowance listed on Schedule A (for any reason including increase or change in the method of assessment), then you agree to pay Ryder the excess. Ryder failure to bill or collect amounts in excess of the allowance in any year shall not be considered a waiver of its right to pursue those amounts. Any blank allowance line on a Schedule A shall be deemed to be a $0 annual allowance.

**D. All Other Taxes.** Unless otherwise specified in this Agreement, you agree to pay for all taxes, fees, special licenses and tolls (whether in effect now or imposed after the date of this Agreement) relating to any Vehicle(s) or to the lease, rental, or other charges under this Agreement (excluding any taxes based on Ryder's net income). If your failure to pay any taxes, fees or tolls results in a claim or lien involving any Vehicle, then Ryder may settle the claim or lien, and you will promptly pay Ryder the full amount of such settlement.

## 5. OPERATION OF VEHICLES; DRIVERS.

**A. Operation of Vehicles; Drivers.** Each Vehicle shall be operated only in the ordinary course of business by properly licensed drivers that are: (i) at least 18 years old; and (ii) your employees or agents and subject to your exclusive direction and control. You will not operate any Vehicle: (i) in violation of any federal, state, or local rules, laws or regulations (including weight and size limits); (ii) in a reckless or abusive manner (including, while using a mobile or electronic device); or (iii) to transport Hazardous Materials (as defined in Paragraph 16C of this Agreement). Nor will you operate any Vehicle in violation of the manufacturer's recommendations, off an improved road, on a flat tire, with warning lights on, with gauges showing dangerous or excessive readings, or improperly loaded. You are not permitted to operate any Vehicle outside of the United States. You are not permitted to use any Vehicle to carry passengers, except as required in the ordinary course of your business. Regardless of any other provision of this Agreement, and even if Ryder is designated on Schedule A as responsible for Physical Damage, you will pay Ryder for all physical damage, repairs, maintenance and related expenses resulting from any violation of this Paragraph 5. Annually and upon Ryder's request, you agree to provide Ryder with a current driver roster in a form reasonably satisfactory to Ryder.

**B. Driver Removal.** If a driver operates a Vehicle in violation of this Agreement, upon written notice from Ryder, you will immediately remove that driver as an operator of any Vehicle. If you fail to do so or are prevented from doing so by contract, then you agree to reimburse Ryder for any damage to any Vehicle that occurs while being driven by that driver, even if Ryder would otherwise be responsible for payment of Physical Damage, and to defend, release, indemnify, and hold Ryder harmless for all resulting Damages and Defense Costs.

## 6. CHARGES AND PAYMENT.

**A. Payment Terms.** You will pay Ryder the full amount of its invoices within 10 days of the invoice date without deduction, setoff, recoupment or counterclaim. Each invoice will be conclusively deemed correct, unless you notify Ryder in writing of any error within 90 days of the invoice date.

**B. Deposit.** Not Applicable

**C. Determination of Mileage and Refrigeration Charges.** Ryder will determine mileages for powered vehicles from odometer readings, mileage for trailers from hub odometer readings, and hours of operation of all refrigeration units from hour meter(s). If the odometer, hub odometer, or hour meter fails to function, you agree to immediately report that failure to Ryder. Ryder will determine mileage or the hours of operation for the period in which the failure existed from (1) your trip records or (2) the average amount of fuel consumed and the miles per gallon shown in Ryder's records for the previous 30 days. If in any month you fail to provide Ryder with complete mileage or meter readings, then on the invoice for that month, Ryder will charge you for 1/12th of the Estimated Annual Mileage (which estimate may be adjust on future invoices based on actual mileages).

**D. Invoicing Frequency.** "Monthly" Invoicing Frequency: Notwithstanding anything in the Vehicle Lease to the contrary, at your request, Ryder will invoice you for charges under this Agreement monthly.

## 7. FINANCIAL REQUIREMENTS AND CONFIDENTIALITY.

**A. Financial Statements.** You agree to provide Ryder with fully disclosed, year-end financial statements for the most recent two years, including all major statements and footnotes and other financial information as Ryder may request from time to time.

**B. Confidentiality.** The parties agree that the terms and conditions of this Agreement, as well as any financial information that you provide to Ryder pursuant to Paragraph 7A, are confidential and neither party shall disclose them to any third party (other than such party's attorneys, accountants or financing partners) unless required by law.

## 8. CPI.

Twice each year, on January 1st and July 1st Ryder may adjust your charges on each Vehicle to reflect changes in Ryder's costs. These adjustments will be computed based on the percentage change in the Consumer Price Index: Urban Wage Earners and Clerical Workers (1967 base period) published by the U.S. Bureau of Labor Statistics (or any successor index designated by Ryder) ("CPI") from the base index listed on Schedule A (the "Base Index"). Ryder will round this percentage change to the nearest one-tenth of one percent and will then adjust your charges by an amount equal to this rounded percentage change in CPI multiplied by the portion of the charges listed below:
* 75 % of the Fixed Charge Per Month (or Week) and 100 % of the Mileage Rate Per Mile
* 100 % of the Refrigerated Maintenance Rate Per Hour (for refrigeration equipment)

Adjustments will be based on the original charges listed on Schedule A and the most recent CPI index figures at the time of adjustment.

## 9. LIABILITY INSURANCE.

**A. Liability Insurance.** The party designated on Schedule A (the "Insuring Party") agrees to furnish and maintain, at its sole cost, a policy of automobile liability insurance with limits specified on each Schedule A for death, bodily injury and property damage, covering both you and Ryder as insureds for the ownership, maintenance, use, and operation of each Vehicle ("Liability Insurance"). If you are the Insuring Party, the terms of the policy and the insurer must be acceptable to Ryder. The Liability Insurance must provide that its coverage is primary and not additional or excess coverage over insurance otherwise available to either party, must be equal in scope in all respects to the insurance coverage provided to you, and must include any and all statutory requirements of insurance imposed upon you and/or Ryder. In addition, the Liability Insurance must provide that it cannot be cancelled or materially altered without 30 days prior written notice to you and Ryder. The Insuring Party agrees to designate the other party as an additional insured on the Liability Insurance and to provide the other party with insurance certificates evidencing the required coverage. Your certificate of insurance must include by special endorsement or otherwise, Ryder as an additional insured for all vehicles leased, rented, substituted or supplied to you by Ryder.
**B. Where Ryder Provides Insurance Coverage** If Ryder is the Insuring Party, then this Agreement is subject to all of the terms and conditions of the Liability Insurance, which will exclude uninsured or underinsured motorist coverage, personal injury protection coverage, medical payment coverage, and/or supplementary no fault coverage. If any of these coverages cannot be rejected, waived, or excluded under the law of any applicable state, or if rejection, waiver, or exclusion is otherwise unenforceable, the coverage will only be provided to the extent and with the minimum limits required by the laws of that state. Upon 30 days notice, Ryder may review and adjust its rates for Liability Insurance or terminate the Liability Insurance. In the event Ryder terminates the Liability Insurance, you will furnish and maintain Liability Insurance in accordance with Paragraph 9A.
**C. Filing Evidence of Liability Insurance.** When Ryder is the Insuring Party, Ryder will, at your request and where required and legal, file evidence of the Liability Insurance and will provide certificates evidencing the Liability Insurance. You agree to defend, release, indemnify, and hold Ryder harmless for all Damages and Defense Costs arising out of or related to payment of losses by Ryder or Ryder's insurer based on any such filing made or certificates issued by Ryder or its insurer, where the loss would not have otherwise been paid except for such filing or certificate.

## 10. INDEMNIFICATION.

**A. Indemnification for Damages and Defense Costs:** You agree to defend, release, indemnify and hold Ryder harmless for all Damages and Defense Costs: (1) in excess of or not covered by Liability Insurance (whether provided by you or Ryder) arising out of or related to the ownership, maintenance, use or operation of each Vehicle; (2) arising out of or related to death or injury to you, your drivers, employees, and agents caused by or related to the ownership, maintenance, use or operation of each Vehicle; (3) arising out of or related to your violation of this Agreement; or (4) arising out of your failure to procure and maintain Liability Insurance (where you are the Insuring Party).
**B. Indemnification for Transportation of Hazardous Material.** Notwithstanding anything in this Agreement to the contrary and even if Ryder is designated on Schedule A as responsible for providing Liability Insurance, if you use any Vehicle to transport Hazardous Materials in violation of this Agreement, then you agree to defend, release, indemnify and hold Ryder harmless from and against all Damages and Defense Costs, arising out of or related to that transportation, regardless of cause, including, but not limited to your negligence, Ryder's negligence, any other failure on your part, or any failure on Ryder's part.
**C. Reimbursement for Clean-up Costs Associated with Fuel Spills.** If you are the Insuring Party and Ryder responds to any incident or accident which has resulted in an environmental spill or release from a Vehicle's fuel tank(s) or engine, you will pay for and/or reimburse Ryder for all costs and expenses incurred by Ryder, including but not limited to, the cost of emergency response contractors, environmental clean-up and disposal costs, fines and penalties.

## 11. PHYSICAL DAMAGE.

**A. Payment of Physical Damage.** The party designated on Schedule A (the "Responsible Party") will pay for all loss, theft or damage ("Physical Damage") to any Vehicle.

*(1) When Ryder is Responsible.* Ryder will pay for Physical Damage in excess of the deductible amount specified on Schedule A, except where the loss or damage results from (i) a violation of Paragraph 5; (ii) any willful damage to a Vehicle including, but not limited to, damage arising out of or in connection with any labor dispute that you are involved in; or (iii) theft by one of your agents or employees. Upon 30 days notice, Ryder may review and adjust its rates for Physical Damage or terminate Physical Damage coverage. If Ryder terminates Physical Damage coverage, you agree to be responsible for Physical Damage under the terms of Paragraph 11A(2).

*(2) When You are Responsible.* You agree to pay for all Physical Damage to any Vehicle, including related expenses, even if the Physical Damage results from Ryder's negligence or occurs on Ryder's premises. If any Vehicle is lost, stolen, or damaged beyond economic repair, then you agree to pay Ryder its purchase price as determined by Paragraph 13C. If any Physical Damage repairs are performed by Ryder, Ryder will charge you at retail sales and service rates (including overtime). Any Physical Damage repair work performed by an unapproved repair shop is subject to Ryder's approval and Ryder may rework any unsatisfactory repair at your expense. You agree to furnish Ryder with evidence of Physical Damage insurance coverage reasonably acceptable to Ryder naming Ryder as a named insured or endorsed as a loss payee.

**B. Vehicle Loss, Theft or Destruction.** If a Vehicle is lost, stolen or in an accident, you agree to immediately notify Ryder and cause your driver to make a report to Ryder as soon as practicable. If a Vehicle is involved in a collision or accident, Ryder will decide within 30 days of

being notified whether that Vehicle is damaged beyond economic repair. If a lost or stolen Vehicle is still missing 30 days after you notify Ryder, or if a Vehicle is damaged beyond economic repair, then the lease on that Vehicle will terminate once you have paid Ryder all amounts owed under this Paragraph 11 and any other outstanding charges. You agree to also provide Ryder with copies of any reports that you have provided to your insurer or any governmental agency and assist Ryder and the insurer in the investigation, defense, or prosecution of any claims or suits. Regardless of who is the Responsible Party, you will pay for the loss of tools, tarpaulins, accessories, spare tires, or other similar equipment furnished by Ryder.

**12. CARGO LOSS OR DAMAGE.** Ryder will not be liable for loss of or damage to any cargo, goods or property in, carried on, or towed by any Vehicle ("Cargo"), even if the loss or damage occurs on Ryder's premises or is caused by Ryder's negligence or any other failure on Ryder's part. You agree to defend, release, indemnify, and hold Ryder harmless for all Damages and Defense Costs arising out of or related to loss or damage to Cargo.

**13. TERMINATION.**

  **A. Annual Termination Rights.** Either party may terminate the lease on any Vehicle on any annual anniversary of its Date of Delivery listed on Schedule A before its full lease term expires by giving the other party at least 60 days prior written notice. If Ryder terminates the lease on any Vehicle and you are not then in default, you will have the right, but not the obligation, to purchase that Vehicle on the date of termination, in accordance with Paragraph 13C, by giving Ryder at least 30 days prior notice. If you terminate the lease on any Vehicle, you will, at Ryder's option, purchase that Vehicle on its effective date of termination in accordance with Paragraph 13C.

  **B. Expiration of Lease.** Upon expiration of its lease term (or upon termination if you are not required to purchase the Vehicle), you agree to return each Vehicle to Ryder at the Maintenance Facility in good and working order without Physical Damage. If you have made any structural alteration to a Vehicle, you agree, at Ryder's option, to restore that Vehicle to its original condition before you return it to Ryder. You will have no right or obligation to purchase a Vehicle when its full lease term expires. Upon expiration of the lease term or termination for any reason, unless you purchase the Vehicle, you agree to pay Ryder the cost to de-identify each vehicle.

  **C. Vehicle Purchases.** If you are required or elect to purchase a Vehicle under this Agreement, the purchase price will be an amount equal to its Schedule A Value plus any sales or use taxes. On the purchase date, you will also pay Ryder any outstanding charges you owe. Your payment will be in cash or by certified cashier's check. Each Vehicle will be purchased "as is, where is" without any warranties, except that upon such purchase Ryder shall assign to you, to the extent permitted by the manufacturer, any manufacturer's warranty applicable to the purchased Vehicle. If you fail to purchase a Vehicle when required to do so, you will pay to Ryder the difference between the Vehicle's Schedule A Value and its wholesale value as of the date you were required to purchase the Vehicle.

**14. BREACH OR DEFAULT.**

  **A. Breach or Default.**

  *(1) Default Procedure.* If you breach this Agreement, then Ryder may send you a notice of default. You will have 7 days from the date that Ryder sends you the notice to cure the default. If you fail to cure a default as required by this Paragraph 14A, then Ryder may, at its option, without prejudice to Ryder's other remedies under this Agreement, at law or in equity: (i) immediately repossess any or all Vehicles, Substitute Vehicles and rental vehicles wherever they may be located, without further demand or notice (unless required by law in the relevant jurisdiction); and/or (ii) terminate the Agreement as to any or all of the Vehicles and require you to purchase any and/or all terminated Vehicles within 10 days in accordance with Paragraph 13C. Repossession of the Vehicles will not automatically terminate the Agreement. You shall be liable for all charges that accrue during the period that Ryder retains the Vehicles.

  *(2) Default under Other Agreements.* If you breach any other agreement between you and Ryder, including but not limited to any rental and/or maintenance agreements, then you will be in default of this Agreement. If you breach this Agreement, you will be in default of any other agreement between you and Ryder.

  **B. Bankruptcy.** It shall be a default under this Agreement if you become insolvent, file a voluntary petition in bankruptcy, make an assignment for the benefit of creditors, are adjudicated bankrupt, permit a receiver to be appointed for your business, or permit or suffer a material disposition of your assets.

**15. MISCELLANEOUS PROVISIONS.**

  **A. Assignment of Lease.** This Agreement will be binding on both parties, and our respective successors, legal representatives, and permitted assigns. **YOU DO NOT HAVE THE RIGHT TO SUBLEASE ANY VEHICLE, NOR THE RIGHT TO ASSIGN THIS AGREEMENT OR ANY INTEREST HEREUNDER WITHOUT RYDER'S PRIOR WRITTEN CONSENT. ANY ATTEMPT TO DO SO WILL BE VOIDABLE AT RYDERS OPTION.** Unless Ryder expressly releases you from your obligations in writing, you will remain liable for all of your and the assignee's obligations under this Agreement including, but not limited to, liability claims, Physical Damage and associated Damages and Defense Costs. Ryder may assign all or part of its interest in this Agreement and any Vehicle without notice to you or your consent.

  **B. Change of Ownership/Sale of Assets** If you change ownership or dispose of a substantial amount of your assets, you will notify Ryder in writing. You shall give Ryder at least 30 days prior written notice of (a) any change of your name, address or state of organization from that set forth above or (b) any proposed merger, consolidation or sale of all or substantially all of your assets or transfer of a majority interest of your ownership interests or control from the persons(s) or entity(ies) holding such interests or control as of the date hereof.

  **C. Force Majeure.** Neither party will be liable to the other if it is prevented from performing under this Agreement by any present or future cause beyond its control. These causes include, but are not limited to, Acts of God, national emergencies, wars, acts of terrorism, riots, fires, labor disputes, federal, state, or local laws, rules or regulations, shortages (local or national), or fuel allocation programs, provided that no Force Majeure event shall affect any of your payment obligations hereunder.

  **D. Limitation of Liability.** Ryder's liability to you for any breach of this Agreement shall be limited to the actual value of the services that Ryder fails to provide. **NOTWITHSTANDING THE FOREGOING, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR PUNITIVE DAMAGES.**

  **E. Notices.** Any notice, demand, consent or request for consent under this Agreement must be written and sent to you or Ryder at the

address specified at the beginning of this Agreement (or any new address of which notice is given). Notices shall be given by certified mail (with a return receipt), overnight delivery service, facsimile transmission (if a written record of either a machine generated or verbal telephonic confirmation is obtained), or hand-delivery. Notices will be effective when sent, unless otherwise specified in this Agreement.

    F. **Savings Clause.** If a court rules that any provision of this Agreement is illegal, invalid, or unenforceable, all other provisions will remain binding, effective, and fully enforceable.

    G. **Waiver.** Delay or failure to exercise, or partial exercise of any right under this Agreement will not operate to waive that or any other right hereunder. By failing to declare or act on a default, a party does not waive that default. Either party may act on any default at any time. **BOTH PARTIES WAIVE ANY RIGHT TO A TRIAL BY A JURY IN ANY LAWSUIT RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.**

    H. **Cumulative Remedies.** All remedies in this Agreement are cumulative and non-exclusive. Each party may exercise any remedy without affecting its right to exercise any other remedy and without impacting its right to bring suit for breach or to pursue other remedies at law or in equity.

    I. **Content and Modification of Agreement** Neither party will be bound by this Agreement until its duly authorized representative signs it. This Agreement is the entire agreement and understanding between the parties concerning its subject matter. All previous written or oral agreements and representations regarding the subject matter of this Agreement will be null and void. The Agreement can be modified only by a written amendment signed by a duly authorized representative of the party against which enforcement is sought. Any attempt to modify orally or through course of performance shall be void.

    J. **Disclaimer of Warranties.** RYDER MAKES NO EXPRESS OR IMPLIED WARRANTY REGARDING ANY VEHICLE, CHARGES, OR ANY OTHER MATTER WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY THAT A VEHICLE IS MERCHANTABLE OR FIT FOR A PARTICULAR PURPOSE OR SPECIAL PURPOSE.

    K. **Survivability.** All of the defense, release, indemnification, and hold harmless provisions of this Agreement shall survive its termination (for any reason) or expiration.

    L. **Governing Law and Jurisdiction.** This Agreement shall be subject to, construed and interpreted under the laws of the State of Florida without regard to its conflicts of laws provisions. The parties agree that the exclusive venue for any action relating to this Agreement shall be in a court of competent jurisdiction in Miami-Dade County, Florida.

    M. **Attorneys' Fees.** If either party initiates litigation to enforce its rights under this Agreement, the prevailing party in such litigation will also be entitled to receive from the other party its reasonable attorneys' fees (pre-trial, trial and appellate) and costs (including those paid to a collection agency).

    N. **Third Party Invoices.** If Ryder engages a third party to perform repairs, maintenance or road service not covered by the fixed and variable charges (e.g. driver abuse, Physical Damage), you agree to pay the third party's charges plus a reasonable mark-up to cover Ryder's related administrative expenses.

    O. **Validity.** A copy, scan or electronic signature of this Agreement or any Schedule A is sufficient and binding in the same manner and for the same purposes as the originally signed version. Neither party may deny the legal effect, validity, or enforceability of this Agreement solely because it is in electronic form and any arguments to this effect are expressly waived. This Agreement shall be admissible in any proceeding as a copy or scan, or with electronic or digital signatures, as if it contained original handwritten signatures.

**16. DEFINED TERMS.**

    A. **Damages:** All damages, claims, suits, causes of action, penalties, fees, costs, expenses and liabilities for death or injury to persons and loss or damage to property, including, but not limited to, damage to the environment and all environmental clean-up costs.

    B. **Defense Costs:** All attorneys' fees, experts' fees, and court costs at trial and on appeal.

    C. **Hazardous Material:** Any cargo, property, or hazardous material in a quantity which requires placarding by the United States Department of Transportation, and any medical, bio-hazardous, or radioactive waste.

    D. **Schedule A Value:** A Vehicle's Original Value specified on its Schedule A, less the total accrued depreciation at the rate specified on Schedule A, plus all unexpired licenses, applicable taxes (including personal property taxes and Federal Heavy Vehicle Use Taxes), prepaid interest and other expenses previously incurred by Ryder relating to the Vehicle, prorated to the date of sale or computation.

| **RYDER TRUCK RENTAL, INC., d/b/a RYDER TRANSPORTATION SERVICES** | **MONSEY ONE INC.** |
|---|---|
| (Ryder) | (Customer/You) |
| By: | By: _[signature]_ |
| Name: Tisiano DiBonaventura | Name: Baruch Guzelgul |
| Title: Director of Sales (DOS) | Title: President |
| Date: | Date: 6-17-14 |

address specified at the beginning of this Agreement (or any new address of which notice is given). Notices shall be given by certified mail (with a return receipt), overnight delivery service, facsimile transmission (if a written record of either a machine generated or verbal telephonic confirmation is obtained), or hand-delivery. Notices will be effective when sent, unless otherwise specified in this Agreement.

F. Savings Clause. If a court rules that any provision of this Agreement is illegal, invalid, or unenforceable, all other provisions will remain binding, effective, and fully enforceable.

G. Waiver. Delay or failure to exercise, or partial exercise of any right under this Agreement will not operate to waive that or any other right hereunder. By failing to declare or act on a default, a party does not waive that default. Either party may act on any default at any time. BOTH PARTIES WAIVE ANY RIGHT TO A TRIAL BY A JURY IN ANY LAWSUIT RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

H. Cumulative Remedies. All remedies in this Agreement are cumulative and non-exclusive. Each party may exercise any remedy without affecting its right to exercise any other remedy and without impacting its right to bring suit for breach or to pursue other remedies at law or in equity.

I. Content and Modification of Agreement. Neither party will be bound by this Agreement until its duly authorized representative signs it. This Agreement is the entire agreement and understanding between the parties concerning its subject matter. All previous written or oral agreements and representations regarding the subject matter of this Agreement will be null and void. The Agreement can be modified only by a written amendment signed by a duly authorized representative of the party against which enforcement is sought. Any attempt to modify orally or through course of performance shall be void.

J. Disclaimer of Warranties. RYDER MAKES NO EXPRESS OR IMPLIED WARRANTY REGARDING ANY VEHICLE, CHARGES, OR ANY OTHER MATTER WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY THAT A VEHICLE IS MERCHANTABLE OR FIT FOR A PARTICULAR PURPOSE OR SPECIAL PURPOSE.

K. Survivability. All of the defense, release, indemnification, and hold harmless provisions of this Agreement shall survive its termination (for any reason) or expiration.

L. Governing Law and Jurisdiction. This Agreement shall be subject to, construed and interpreted under the laws of the State of Florida without regard to its conflicts of laws provisions. The parties agree that the exclusive venue for any action relating to this Agreement shall be in a court of competent jurisdiction in Miami-Dade County, Florida.

M. Attorneys' Fees. If either party initiates litigation to enforce its rights under this Agreement, the prevailing party in such litigation will also be entitled to receive from the other party its reasonable attorneys' fees (pre-trial, trial and appellate) and costs (including those paid to a collection agency).

N. Third Party Invoices. If Ryder engages a third party to perform repairs, maintenance or road service not covered by the fixed and variable charges (e.g. driver abuse, Physical Damage), you agree to pay the third party's charges plus a reasonable mark-up to cover Ryder's related administrative expenses.

O. Validity. A copy, scan or electronic signature of this Agreement or any Schedule A is sufficient and binding in the same manner and for the same purposes as the originally signed version. Neither party may deny the legal effect, validity, or enforceability of this Agreement solely because it is in electronic form and any arguments to this effect are expressly waived. This Agreement shall be admissible in any proceeding as a copy or scan, or with electronic or digital signatures, as if it contained original handwritten signatures.

16. DEFINED TERMS.

A. Damages: All damages, claims, suits, causes of action, penalties, fees, costs, expenses and liabilities for death or injury to persons and loss or damage to property, including, but not limited to, damage to the environment and all environmental clean-up costs.

B. Defense Costs: All attorneys' fees, experts' fees, and court costs at trial and on appeal.

C. Hazardous Material: Any cargo, property, or hazardous material in a quantity which requires placarding by the United States Department of Transportation, and any medical, bio-hazardous, or radioactive waste.

D. Schedule A Value: A Vehicle's Original Value specified on its Schedule A, less the total accrued depreciation at the rate specified on Schedule A, plus all unexpired licenses, applicable taxes (including personal property taxes and Federal Heavy Vehicle Use Taxes), prepaid interest and other expenses previously incurred by Ryder relating to the Vehicle, prorated to the date of sale or computation.

| RYDER TRUCK RENTAL, INC., d/b/a RYDER TRANSPORTATION SERVICES | MONSEY ONE INC. |
|---|---|
| (Ryder) | (Customer/You) |
| By: _____ | By: _____ |
| Name: Tristano DiBonaventura | Name: Baruch Guzelgul |
| Title: Director of Sales (DOS) | Title: President |
| Date: _____ | Date: 6-17-14 |



# MASTER TRAILER LEASE AND SERVICE AGREEMENT

**STAR LEASING CO.** ("Lessor"), with principal offices at 4080 Business Park Drive, Columbus, Ohio 43204 leases to Monsey One, Inc. ("Customer"), 18 Pulaski Street, Bayonne, NJ 07002 upon the following terms and conditions, those trailers described in each executed Schedule "A" from time to time upon the terms of this Master Trailer Lease and Service Agreement and the related Schedule "A". Each Schedule "A" shall constitute a separate lease incorporating the terms of this Master Trailer Lease and Service Agreement, and of all other schedules and exhibits related hereto. References in this Master Trailer Lease and Service Agreement to "this Agreement", "hereunder" and "herein" shall be construed to mean any Schedule "A" which incorporates this Master Trailer Lease and Service Agreement, together with all other schedules and exhibits related hereto. All trailers described in each executed schedule, together with interim, substitute, and extra trailers as provided under this Agreement, are collectively referred to herein as "trailer(s)" unless otherwise stated.

**1. TERM:** The lease term for each trailer under this Agreement begins on Customer's acceptance of such trailer in accordance with paragraph 2 below and continues until expiration of the lease term as indicated in the applicable Schedule "A", unless earlier terminated as provided in this Agreement. Execution by Customer of this Agreement and each Schedule "A" and all applicable schedules and exhibits will authorize Lessor, upon Lessor's acceptance thereof, to acquire, if necessary, the trailer(s) described for lease to Customer.

**2. TRAILER ACCEPTANCE:**

**(a)** Each Schedule "A" trailer will conform to the specifications contained thereon and to any further specifications contained in any related Schedule "S" which may be attached to this Agreement. Customer will take delivery of, and charges will begin for, each trailer upon actual delivery or within 48 hours of notification of availability for delivery, whichever is earlier (hereinafter "Delivery Date"). Lessor's delivery of the trailer(s) leased hereunder may be subject to delay in manufacture or delivery. Customer agrees that Lessor shall not be held responsible for any such delay, and Customer will indemnify Lessor and will hold Lessor harmless from any direct, incidental or consequential damages which Customer or any other parties may incur as a result of such delay. Upon delivery of each trailer, Customer will complete and sign an Equipment Interchange Agreement. Unless Customer has given written notice within 24 hours after the Delivery Date that a trailer does not conform to the specifications contained in either Schedule "A" or Schedule "S", such trailer will be deemed to be accepted as of the Delivery Date, to comply with Customer's specifications, and to be in proper repair, mechanical condition and running order.

**(b)** As to any Schedule "A" trailer which was on rent to Customer pursuant to an Equipment Interchange Agreement or other rental agreement prior to Customer's execution of this Agreement, such trailer shall automatically be deemed to be accepted by Customer as of Lessor's Acceptance Date hereunder, to comply with Customer's specifications, and to be in proper repair, mechanical condition and running order. For this and all other purposes of this Agreement, Lessor's Acceptance Date hereunder shall be the "Delivery Date" of such trailer.

**3. LEASE CHARGES:**

**(a) Records:** Customer agrees to cause its drivers to record the mileage and hourly readings for each trailer on a regular basis. From this information Customer will furnish monthly to Lessor a complete record of the hours and miles for each trailer. Customer shall immediately notify Lessor if any hubodometer or refrigerated van hourly meter has been removed or fails to function properly. If for any period of time the refrigerated van hourly meter of any trailer fails to function, or if Customer fails to report the hours as required herein, the refrigeration hours usage applicable during that time period shall be the higher of (i) the hours usage indicated by Lessor's records for Customer from prior transactions or (ii) 12 refrigeration hours per day. If mileage charges are applicable but documentation of actual mileage is not available or Customer fails to report the same, estimated monthly mileage charges will be calculated at $1/12^{th}$ of the estimated annual mileage times the mileage charge as set forth on the applicable Schedule A.

**(b) Charges:** For the use of each trailer, Customer will pay Lessor an amount consisting of the "Fixed Charge" payable independently of the use of the trailer and a "Mileage Charge" and "Refrigeration Hourly Charge", as applicable, computed on the total number of miles and hours each trailer is operated. The "Fixed Charge", "Mileage Charge" and "Refrigeration Hourly Charge" are stated in the applicable Schedule "A" for such trailer. All payments are to be made in U.S. Dollars, and are payable without notice or demand.



**(c) Payments:** Lease periods under this Agreement will end at midnight on the last calendar day of the month when Fixed Charge per Month is indicated on the Schedule "A", or at midnight on Saturday of each week when Fixed Charge per Week is indicated. When Fixed Charge per Month is indicated, Customer's first lease payment for each trailer shall be billed upon the Delivery Date of such trailer, and shall be in an amount equal to the "Fixed Charge per Month" prorated for the number of days such Trailer is in service during that month. Thereafter, on the first working day of each month, Lessor will invoice Customer for the Fixed Charge in advance plus all other charges (i.e., mileage and hourly charges, maintenance fees, etc.) that have been incurred by Customer in the lease period just ending. When Fixed Charge per Week is indicated, Lessor will invoice Customer for all charges due from Customer for each lease period just ending. Nevertheless, Lessor hereby reserves the right to convert all weekly lease payment requirements to monthly lease payment requirements, or to convert all monthly lease payment requirements to weekly lease payment requirements. Customer shall pay to Lessor the full amount of all invoices within 20 days of the invoice date, without set-off or other deductions. If any amount is not paid when due, interest shall be assessed from the due date at the rate of 18% per annum or the maximum rate allowed by law, whichever is less. Payments received by Lessor after the due date shall be applied first to the most recent invoices issued to Customer without regard to Customer's instructions. If Customer questions the correctness of any invoice, Lessor must be advised immediately; unless Lessor is so advised by Customer of such protest within 5 days after receipt of such invoice by Customer, such invoice shall be presumed for all legal purposes to be correct.

**(d) GPS Mileage Alternative:** Some of Lessor's trailers may be equipped with tracking units based upon GPS technology which allows Lessor to obtain a precise, historical record of where a trailer has been and how many miles it has been transported by Customer. Notwithstanding the provisions contained subparagraph (a) above, the parties hereto agree that in the event GPS mileage records are available for a trailer, those records shall be used as the basis for Lessor's calculation of mileage charges. If Lessor has billed Customer based upon estimated mileage, or based upon hubodometer mileage or otherwise pursuant to subparagraph (a) above, Customer agrees to pay Lessor for all unbilled mileage based upon GPS mileage records upon receipt of Lessor's invoice therefor. In addition to the foregoing, GPS mileage records shall be used whenever available in the calculation of all other charges to Customer under this Agreement that are based upon mileage. Upon Customer's written request, Lessor will provide Customer with copies of the applicable GPS mileage records.

**(e) Security Deposit:** As security for the prompt and full payment of all charges and the faithful and timely performance by Customer of all provisions of this Agreement and any extension or renewal thereof, Customer has pledged and deposited with Lessor the amount set forth in any Schedule "A". In the event of any default by Customer under this Agreement or a related Schedule "A", Lessor shall have the right, but shall not be obligated, to apply the security deposited under any Schedule "A" to the curing of such default, including application to reimburse Lessor for Lessor's legal fees and other enforcement costs and expenses incurred in connection with such default. Any such application by Lessor shall not be a defense to any action by Lessor arising out of said default; and, upon demand, Customer shall restore said security to the full amount(s) set forth in any Schedule "A". Upon the expiration or earlier termination of this Agreement, or any extension or renewal thereof, if Customer has paid all of the charges herein called for and fully performed all of the other covenants of this Agreement on its part to be performed, Lessor will return to Customer any then remaining balance of said security, without interest.

**(f) ACH Transactions.** Lessor may but shall not be required to offer to Customer the option of paying any of Customer's obligations to Lessor through Automated Clearing House ("ACH") transactions drawn pursuant to this authorization upon Customer's checking account, using Customer's checking account number, bank routing code and other information which Customer provides to Lessor prior to the first ACH transaction. Customer authorizes Lessor to initiate ACH transactions from Customer's checking account in the amount necessary to pay all payments as may now or hereafter be due under this Agreement, plus a fee of $5.00 for each ACH transaction initiated by Lessor. In the event applicable law prohibits or restricts the amount of such fee, the fee chargeable under this provision shall be limited and/or restricted in accordance with applicable law. Lessor may from time to time increase or decrease the ACH transaction fee upon prior notice, and such increase or decrease shall be effective as stated in the notice. Unless prohibited by applicable law, Customer's continued use of ACH transactions after the effective date specified in such notice shall conclusively establish Customer's agreement to pay the new ACH transaction fee stated therein. Until cancelled by Customer, this authorization shall be valid for all ACH transactions Lessor initiates in payment of Customer's obligations under this Agreement. This authorization may be cancelled at any time by Customer giving at least 3 business days prior written notice to Customer's bank and to Lessor.

4. **SERVICE:**
   **(a) General:** Except as otherwise provided in this Agreement or in a related Schedule "A" or Schedule "N" attached to and made a part of this Agreement, Lessor will perform the following ordinary maintenance upon each trailer:

(1) All FHWA inspections;
(2) Preventive maintenance specified on the related Schedule PM;
(3) All brake and tire replacements due to normal usage and wear; and
(4) Painting and lettering within the limits described in the related Schedule "A" or Schedule "S" for all but interim, substitute, or rental trailers, at a facility designated by Lessor.

**(b) Servicing and Repair:** Customer will make each trailer available to Lessor at the Domicile of Trailers specified on the related Schedule "A" or at any of Lessor's branch locations for a minimum of 2 hours during each 120 days of the term of this Agreement or any extension thereof, during Lessor's normal business hours, for the ordinary maintenance service described in subparagraph (a) above, and at such time will report in writing any adjustments or repairs needed on the trailer. If Lessor agrees, at its sole option, to provide any ordinary maintenance service (other than tire replacements due to normal usage and wear) at some other location through an outside vendor, Customer agrees to pay Lessor upon receipt of Lessor's invoice for all amounts paid to such outside vendor for that ordinary maintenance service. Lessor will not provide a substitute trailer during these periods of scheduled service. Customer agrees not to cause or permit any party other than Lessor or parties expressly authorized by Lessor to make repairs or adjustments to any trailer, and when such repairs are necessary, Customer will promptly notify Lessor by the fastest means of communication available. Customer further agrees that all repairs should be completed to Lessor's satisfaction. All ordinary maintenance described in subparagraph (a) above will be at Lessor's cost and expense unless the repairs or service are (i) caused or made necessary by the Customer's negligence, improper use or violation of this Agreement; (ii) the result of unauthorized repair, alterations or modifications; or unless Customer assumes responsibility for ordinary maintenance under a Schedule "N" to this Agreement or pursuant to subparagraph (e) below. All repairs other than the ordinary maintenance described in subparagraph (a) above will be at Customer's cost and expense. Items not covered by Lessor which are Customer's responsibility, financially and otherwise, include, but are not limited to, all physical damage items; all mud flap replacements; all light bulb replacements, brake adjustments, and maintenance of proper fluid levels and tire pressures between scheduled services; repair of flat tires, road hazards, and physically damaged tires; all ordinary maintenance required between scheduled services; and de-identification at the end of the term of this Agreement, including but not limited to the removal of any and all decals and any specialized painting, and related repainting. Whenever Customer is obligated to pay for repairs due to accident, fire, theft, vandalism or any other cause, Customer shall pay to Lessor the current retail prices for parts and labor then being charged by Lessor that would be incurred to repair the trailer and restore it to good repair, condition and working order (regardless of whether Lessor elects to make such repairs). Lessor shall not be responsible for any repairs or service performed while the trailer is away from Lessor's facility unless expressly authorized by Lessor in writing. Customer shall return to Lessor, at Customer's expense, all parts and tires authorized by Lessor for replacement, and if such parts or tires are not so returned, Customer shall remain responsible for the cost of such replacement parts and tires. If Customer seeks reimbursement for authorized repairs or adjustments, Customer shall furnish Lessor with a dated original receipt showing the cost, the specific trailer repaired, the date of repair and the hubodometer reading at the time of repair, along with the signature of Customer's driver.

**(c) Excess Tire and Brake Wear:** If upon the return of any trailer or upon the replacement of any tire by Lessor tread wear exceeds 1/32nd inch per tire for each 6,000 miles traveled for a trailer with bias ply tires or 12,000 miles for the trailer with radial tires, Customer shall pay Lessor a charge, based upon the then current tire price, for each 1/32nd inch or fraction thereof of tread wear in excess of such allowances. If upon the return of any trailer or replacement of brakes by Lessor brake wear is in excess of 1/8th inch per wheel position for each 25,000 miles traveled, Customer shall pay Lessor a charge, based upon the then current price for a brake reline service, for each 1/8th inch or fraction thereof of lining wear in excess of such allowance. Customer shall be responsible for the replacement cost for cracked or scored brake drums.

**(d) Substitution:** Unless otherwise stated on the related Schedule "A", if any Schedule "A" trailer is mechanically disabled and the sole cause of the mechanical disability is Lessor's failure to properly perform its maintenance obligations under this Agreement, Lessor will, at no additional charge and within a reasonable time after notice from Customer, substitute a reasonably comparable trailer which will also be subject to all terms and conditions of this Agreement. When the mechanically disabled trailer is repaired, Lessor will notify Customer and Customer will promptly return the substitute trailer to a location designated by Lessor. Notwithstanding the foregoing, Lessor will not be obligated to supply a substitute trailer if the trailer is specialized, or if the trailer is of a type Lessor does not have available in its rental fleet. Furthermore, Lessor will not under any circumstances be obligated to supply a substitute trailer if Customer is, or at any time has been, in default of this Agreement, whether or not Lessor has declared a default. Lessor's failure to furnish a substitute trailer within a reasonable time, when it is obligated to do so hereunder, will not be deemed a breach of this Agreement; rather such failure shall cause the lease charges for the inoperable trailer to abate until the trailer is returned to service or until a substitute trailer is made available to Customer.

**(e) Customer Obligations:** Unless otherwise agreed in writing, Customer assumes responsibility for all preventive, ordinary and other maintenance of any trailer immediately upon (i) Customer's failure to make such trailer available for maintenance and service at the Domicile of Trailers specified on the related Schedule "A" or at any of Lessor's branch locations, or as otherwise expressly required in subparagraph (b) above, or (ii) Customer's failure to pay to Lessor any amount due under this Agreement within 20 days from the date of the invoice therefore, time being of the essence. Such assumption of responsibility shall not result in the reduction of any charges payable by Customer to Lessor under the Agreement. In addition to Customer's obligations set forth elsewhere in this Agreement, Customer will be responsible for all costs related to: (i) damage to trailer tires; (ii) damage due to operation of a trailer off a paved road; (iii) damage to a trailer resulting from Customer's failure to check and maintain adequate lubricant levels daily; (iv) damage or liability resulting from Customer's failure to properly maintain any trailer or special equipment not maintained by Lessor under this Agreement or other maintenance agreement between Customer and Lessor; and (v) overloading, abusive or negligent operation. Customer will pay, and hold Lessor harmless from, all fines, claims, forfeitures or penalties arising from any such events. **(f) Repair Estimate Policy:** As to any repairs to be performed by Lessor which are the responsibility of Customer under this Agreement, Lessor shall prepare an estimate for parts and labor within a reasonable time after the damaged trailer has been redelivered to Lessor. Lessor shall then mail, fax or email the estimate to Customer, who shall have 2 business days from the date of the estimate either to accept or reject the same. Unless Customer has given written notice within that 2 day period that the estimate has been rejected, Customer will be deemed to have accepted the estimate. Customer hereby expressly agrees to pay upon receipt Lessor's invoice for any accepted estimate. Unless otherwise agreed in writing between the parties, if Customer rejects Lessor's estimate, Customer shall be responsible for obtaining another estimate for the same repairs from a trailer repair company expressly approved by Lessor. If approved by Lessor, Customer may proceed to have the trailer repaired by the approved trailer repair company, at Customer's expense, and subject to all requirements of subparagraph (b) above. Customer acknowledges that whether the trailer is repaired by Lessor or an approved trailer repair company, Customer is responsible to pay to Lessor the Fixed Charge, Mileage Charge and Refrigeration Hourly Charge indicated in the related Schedule "A" during the estimate and repair process, and Customer agrees to pay those charges without abatement during that period of time. Furthermore, if the repairs occur at the end of the term of this Agreement, Customer agrees to pay the Fixed Charge, Mileage Charge and Refrigeration Hourly Charge indicated in the related Schedule "A" until the trailer has been returned to Lessor and Lessor has either completed all repairs or, in the case of repairs made by other parties, Lessor has approved all repairs. Notwithstanding the foregoing, Lessor's failure to provide Customer with an estimate pursuant to this subparagraph (f) shall not relieve Customer from its responsibility for payment for such repairs; but in that event, Customer's obligation shall not exceed Lessor's then current retail prices for parts and labor.

**5. RENTAL TRAILERS:** Upon Customer's request and if Customer financially qualifies, Lessor may at Lessor's sole discretion provide trailers as available from Lessor's rental fleet for daily, weekly or monthly rental. Each rental trailer so supplied shall be subject to all terms and conditions of this Agreement, with the following exceptions: (i) the charges to Customer for such trailer will be set forth on the Equipment Interchange Agreement relating to such trailer; (ii) Lessor will invoice Customer in advance, either weekly or monthly at Lessor's sole option, for all rentals; (iii) Lessor shall not be required to provide special lettering, painting, alterations, accessories, or equipment for such rental trailers; and (iv) paragraphs 6 and 8(a) of this Agreement shall not apply.

**6. INTERIM TRAILERS:** Upon Customer's request, Lessor will provide trailers to be used until delivery of Customer's Schedule "A" trailers, provided such like trailers are available from Lessor's rental fleet at the Domicile of Trailers shown on the related Schedule "A". When both parties have executed this Agreement, trailers furnished shall be subject to all terms and conditions of this Agreement and will be considered "interim trailers". Customer will pay the Fixed Charge, Mileage Charge and Hourly Charge indicated in the related Schedule "A" as the "Interim Trailer Charge". In the event Registration Fees, including base plate, proration and/or reciprocity permits, Federal Highway Use Taxes, personal property, excise or ad valorem taxes, or any other costs are not included in the Fixed Charge, Mileage Charge or Refrigeration Hourly Charge for each trailer, then Lessor shall adjust the Interim Trailer Charge to cover these expenses. Trailers furnished upon Customer's execution of this Agreement, but prior to execution by Lessor, will be rented to Customer under the normal qualifications, terms and conditions stated in Lessor's standard Equipment Interchange Agreement. If Lessor subsequently executes this Agreement, Customer will be given credit for the amount by which the rental rate (excluding insurance charges) exceeds the "Interim Trailer Charge" stated in the related Schedule "A" for like trailers retroactive to the day the trailers were furnished to Customer, but in no case prior to the date of Customer's execution of this Agreement.

**7. INSURANCE:**

**(a) Liability Coverage:** Customer agrees, at its own expense, to provide and maintain, at all times during the term of this Agreement, auto liability insurance covering all trailers (including all substitute, interim and extra trailers) with a limit of not less than $1,000,000.00 for bodily injury and property damage resulting from any one accident,

except that in the event Customer transports any substances which are classified as hazardous substances by the United States Department of Transportation, the minimum amount of insurance required hereunder shall be $5,000,000.00 for bodily injury and property damage resulting from any one accident.

Customer will be responsible for and will indemnify and hold Lessor harmless from any and all claims, costs, expenses, damages and liabilities arising from or pertaining to the possession ownership, maintenance, condition, use or operation of said trailers whether or not covered by such insurance and/or in excess of the limit above.

**(b) Physical Damage Coverage:** Customer agrees at its own expense to provide and maintain, at all times during the term of this Agreement, physical damage insurance covering the trailers for loss, destruction, collision, fire, theft and causes customarily covered by comprehensive physical damage and combined additional coverage insurance, for the replacement value of the trailers (including all substitute, interim and extra trailers). With the prior written consent of Lessor, Customer may self-insure for any, all or part of the full value of the trailers. Lessor's consent allowing customer to self-insure will not be effective until Customer has signed Lessor's self-insure agreement, which will thereafter be kept on file with Lessor.

Customer will be responsible for and will indemnify and hold Lessor harmless from any and all claims, costs, expenses, damages and liabilities arising from any and all physical damage to, or loss of, the trailers from any cause whatsoever, regardless of the care, custody, and control of the trailer or whether such loss or damage is covered by the insurance specified herein, including but not limited to damage to or loss of accessories and all towing expenses. In the event of loss or irreparable damage, Customer's responsibility shall include the towing and storage of the damaged trailer, together with the actual cost of a like replacement trailer in the pre-casualty condition of the trailer to be replaced and all of Lessor's costs and expenses relating thereto, including but not limited to (i) the locating, purchasing, inspecting, transporting, acquiring, licensing, titling, repairing and modifying of the replacement trailer, and (ii) all other inspections, de-identification, decal installation and repairs required to bring the replacement trailer into conformance with the requirements of paragraph 4 (a) and (b) of this Agreement and the Normal Wear Schedule.

Customer will notify Lessor immediately of the theft of, or loss or damage to, any trailer, and in the case of physical damage, Lessor will determine if the trailer is road worthy and may continue in operation. All repairs will be conducted at a shop satisfactory to Lessor and each trailer will be subject to inspection by Lessor upon the completion of repairs. Customer will be notified promptly if repairs are not acceptable and the trailer will not be returned to operation by Customer until the repairs are satisfactory to Lessor. In no event will Lessor, as a result of any exercise of its right of inspection hereunder, be deemed to have made any representation or warranty to Customer as to the adequacy or safety of any repairs, it being expressly understood that Lessor's right of inspection hereunder is for the sole and limited purpose of allowing Lessor to protect its interest in the trailers and to satisfy Lessor that all repairs are adequate.

In the event of theft or total loss of any trailer, and provided Customer has performed all of its obligations under this Agreement, including but not limited to payment of all amounts due pursuant to this paragraph 7 (b), Lessor, at its option, will within 30 days: (1) terminate this Agreement as to such trailers; or (2) provide a replacement trailer for the remainder of the lease term subject to all terms and conditions of this Agreement.

**(c) Requirements:** Customer will obtain the insurance coverages as specified in this paragraph 7 (a) and (b) with an insurance carrier rated B+ or better in Best's Key Rating Guide, with a deductible of not more than $2,500 and in a form otherwise satisfactory to Lessor, which names Lessor and any other party designated by Lessor by endorsement to the policy or policies as an additional insured and loss payee, and provides a waiver of subrogation by such insurance company in favor of Lessor. Prior to the delivery by Lessor to Customer of each trailer, and on each anniversary of such delivery date, and at any time upon request by Lessor, Customer will provide Lessor with a certificate of insurance for each trailer, certifying (i) that such insurance coverage cannot be canceled, terminated or materially changed without 30 days prior written notice to Lessor, (ii) that all losses under physical damage policies shall be payable solely to Lessor (or any other party designated in writing by Lessor) and (iii) that no act or omission of Customer or any of its officers, agents, employees or representatives shall affect the obligation of the insurer to pay the full amount of any loss. In the event that Customer fails to provide and maintain the required insurance coverage or fails to furnish Lessor with required evidence of such insurance, Lessor is authorized but not required to obtain such insurance on behalf of Customer and Customer agrees to pay Lessor on demand for the cost of the insurance so obtained and, alternatively, Lessor may terminate this Agreement. Customer agrees to comply with any loss prevention policies which may be adopted by Lessor from time to time.

**(d) Trailer Contents; Loading Or Unloading:** Lessor shall not be liable for loss of or damage to any goods, cargo or property ("Property") contained in or upon any trailer (whether or not owned by Lessor) at any time or place, including a garage or location operated by Lessor (whether or not said loss or damage was caused by or related to the negligence of Lessor, its agents, servants or employees), and Customer agrees to release and indemnify Lessor



and Lessor's insurer, and hold them harmless from, any and all claims, demands and liability relating directly or indirectly to (i) any loss of or damage to Property while such Property is in or upon such trailer or while such Property is being loaded onto or unloaded from any trailer; and (ii) injury to any person which arises from the loading or unloading of any trailer.

**(e) Defense And Prosecution Of Claims:** Customer and its agents and employees will cooperate with Lessor and any insurer in the reporting, investigation, prosecution or defense, in any manner reasonably requested by Lessor, respecting all accidents, claims or suits arising from the operation of the trailers; will promptly deliver to Lessor copies of all papers or notices served upon or delivered to Customer, its agents or employees; and will otherwise comply with the notification requirements of Customer's insurance carrier. Without limiting the foregoing, Customer will notify Lessor immediately upon the occurrence of any accident involving a trailer and will cause the driver involved to complete the accident report form supplied by Lessor and to otherwise cooperate within the meaning of this paragraph. Customer hereby irrevocably appoints Lessor as Customer's attorney-in-fact to settle and adjust claims with its insurance carrier for physical damage to the trailers and to endorse the name of Customer on any check, draft or other item of payment for the proceeds of such insurance policies. Customer is hereby authorized, unless otherwise directed in writing by Lessor (i) to make and timely file all claims under the policy or policies of insurance and (ii) unless Customer is then in default under this Agreement, to settle and adjust all such claims, but only with the prior written approval of Lessor.

No loss of or damage to the trailers, or any part thereof, shall relieve Customer of any of its payment or other obligations under this Agreement, which shall continue in full force and effect.

## 8. REGISTRATION, TAXES AND LIENS:

**(a) Registration:** Unless otherwise provided in the related Schedule "A", Customer will supply all base plates, proration and reciprocity permits required by law.

**(b) Taxes:** Unless otherwise provided in the related Schedule "A", Customer shall promptly pay when due all sales, use, personal property, ad valorem, excise, and other taxes and all license and registration fees now or hereafter imposed by any governmental body or agency upon the trailers or its use, purchase, ownership, delivery, leasing, possession, storage, operation, maintenance, repair, return or other disposition of the trailers, or for titling or registering the trailers, or upon the income or other proceeds received with respect to the trailers or this Agreement or the rentals hereunder; provided, however, that Customer shall not be required to pay taxes on or measured by the net income of Lessor. Customer shall prepare and file all tax returns relating to taxes for which Customer is responsible hereunder which Customer is permitted to file under the laws of the applicable taxing jurisdiction.

**(c) Liens:** Customer agrees to keep this Agreement, each Schedule "A" and all trailers leased hereunder free and clear of all liens, security interests and encumbrances by or through Customer. Lessor will have the right to pay any fines or discharge any liens or encumbrances asserted against a trailer by or through Customer, including, without limitation, those resulting from Customer's failure to pay any traffic citation, assessment or charge for licenses, permits or taxes for which the Customer is responsible under this Agreement, and Customer will reimburse Lessor for such payments upon demand.

## 9. USE OF TRAILERS:

**(a) Business Purposes:** Customer agrees that the trailers are leased and will be used for business and commercial purposes and not for personal, household, agricultural or passenger carrying purposes. Trailers leased for storage purposes will be used for storage only and not for transporting goods. **(b) Prohibited Use:** Customer will not permit any trailer to be used (i) except as may be permitted by applicable law, to transport any property or material deemed toxic or hazardous by reason of being flammable, corrosive, explosive, fissionable, regulated by any local, state, or federal governmental authority or designated as a "hazardous substance," "hazardous waste," or "regulated substance," under any Federal Act; (ii) in violation of any recommendations of the manufacturer; (iii) in violation of any applicable law, regulation or ordinance including the rules and regulations of the U.S.D.O.T.; or (iv) to transport any cargo (A) for which the trailer was not designed or is not suitable for, (B) which may damage the trailer, or (C) which may create an unreasonable risk of damage to the trailer or to third parties during the transport or subsequent use of any hazardous substances. Customer will indemnify and hold Lessor harmless from any costs or liabilities resulting from any such prohibited use.

**(c) Operation and Drivers:** Customer agrees that the trailer(s) will be operated by safe and careful drivers, properly licensed, properly qualified (U.S.D.O.T. requirements), at least 21 years of age, who will be deemed to be the Customer's agents under the Customer's direction and control. Customer will not permit a trailer to be operated outside the continental United States or Canada without prior written consent by Lessor. Customer will not permit a trailer to be operated by a driver under the influence of alcohol or drugs. Lessor may investigate each driver's record,



and if, in the reasonable opinion of Lessor, the driver is unfit to operate a trailer, Lessor will notify Customer to remove such driver. If Customer fails to remove the driver: (1) Customer will be responsible for any loss or expense and will indemnify and hold Lessor harmless from any claims, demands, or liabilities resulting from the operation of the trailer by such driver, and (2) after 30 days written notice, Lessor may, at its option, cancel this Agreement for default as provided below. In the event a trailer is disabled or left unattended, Customer will cause its drivers to lock and secure trailers and, if required, place proper warning devices in and around the trailer to prevent damage, vandalism and theft.

**10. OVERLOADING:** Customer will not overload any trailer in excess of the weight for which it was designed, and will pay for towing service and all damages and fines resulting from overloading. Lessor may request, and Customer agrees to furnish, payload weight documentation.

**11. OBSERVANCE OF LAWS:**

**(a)** Customer will comply with all applicable federal, state, local or foreign laws, ordinances, rules and regulations applicable to the use, possession, operation or control of the trailers, including, without limitation, all safety, inspection, efficiency and environmental requirements ("Applicable Law"). If there are changes in any Applicable Law requiring the installation of additional equipment or accessories or modification of the trailers listed in any Schedule "A", Lessor will modify the trailers to comply with Applicable Law, and Customer will pay for all costs incurred therefor. All parts, modifications and improvements to the trailers shall, when installed or made, immediately become the property of Lessor and part of the trailers for all purposes.

**(b)** Customer agrees that the trailers will not be used for any unlawful purpose, or for transportation of persons. Customer will pay any and all fines, tolls, user fees, traffic tickets, parking tickets and charges, towing and storage expenses and all other similar fines, fees or charges relating to the trailers during the lease term and until the trailers are returned to Lessor and will indemnify and hold Lessor harmless therefrom. In the event a trailer is impounded as a result of a violation, Customer will continue to pay all charges hereunder.

**(c)** Customer will comply with all manufacturer's instructions and warranty requirements, and with the conditions and requirements of all policies of insurance relating to the trailers and their use.

**(d)** For any trailer that is a 53-foot or longer box-type trailer that may be pulled by a heavy-duty tractor on a highway within California, the following additional provisions apply:

**(1) The Customer of this box-type trailer understands that when using a heavy-duty tractor to pull a 53-foot or longer box-type trailer on a highway within California, the box-type trailer must be compliant with Sections 95300 – 95311, Title 17, California Code of Regulations; and that it is the responsibility of the Customer to ensure this box-type trailer is compliant. The regulations may require this trailer to have low rolling resistance tires and aerodynamic technologies that are U.S. Environmental Protection Agency Verified SmartWay Technologies prior to current or future use in California.**
(2) Customer is authorized to and shall modify each such trailer to comply with the aforementioned regulations (the "California HDV Regulations", as they may be amended from time to time, and will comply with all reporting requirements under the California HDV Regulations. Any modifications shall be made in accordance with the recommendations and standards set by the manufacturer of the parts or devices included in such modification. Any such modifications shall become property of Lessor upon attachment to the trailer, <u>provided</u> that Lessor may require Customer to remove such modifications if and when any trailers are returned to the Lessor.
(3) Customer shall not permit any trailer that does not comply with the California HDV Regulations to be operated in the State of California. Customer shall be solely responsible for, and shall indemnify, defend and hold Lessor harmless from and against, any and all claims resulting from the breach of this Section 11(d).

**(e)** For any trailer that includes refrigeration units, the following additional provisions apply:

(1) Customer shall comply with Section 2477 of Title 13 of the California Code of Regulations governing the operation of refrigerated units of trailers in the State of California (as amended from time to time, the "California TRU Regulations").
(2) Customer will modify each such trailer to comply with the TRU Regulations, as they may be amended from time to time, and will comply with all reporting requirements under the California TRU Regulations. Any modifications shall be made in accordance with the recommendations and standards set by the manufacturer of the parts or devices included in such modification. Any such modifications shall become property of Lessor upon attachment to the trailer, <u>provided</u> that Lessor may require Customer to remove such modifications if and when any trailers are returned to the Lessor.



(3) Customer shall not permit trailers that do not comply with the TRU Regulations to be operated in the State of California. Customer shall be solely responsible for, and shall indemnify, defend and hold Lessor harmless from and against, any and all claims resulting from the breach of this Section 11(e).

(4) Customer shall be solely responsible for all expenses associated with compliance and the performance of all of the foregoing obligations.

**(f)** In addition to the foregoing, Customer is authorized to and shall modify each such trailer to comply with environmental regulations hereafter enacted in any other state, country or territory in which they are pulled on a highway ("Other Environmental Regulations"), as they may be amended from time to time, and will comply with all related reporting requirements. Any modifications shall be made in accordance with the recommendations and standards set by the manufacturer of the parts or devices included in such modification. Any such modifications shall become property of Lessor upon attachment to the trailer, provided that Lessor may require Customer to remove such modifications if and when any trailers are returned to the Lessor. Customer shall not permit any trailer that does not comply with the Other Environmental Regulations to be operated in any state, country or territory where such Other Environmental Regulations are in effect. Customer shall be solely responsible for and shall indemnify, defend and hold Lessor harmless from and against (i) all expenses associated with compliance and the performance of all of the foregoing obligations; and (ii) any and all claims resulting from the breach of this Section 11(f).

**12. ADJUSTED CHARGES:** Lessor and Customer recognize that the charges stated in this Agreement are based on Lessor's current costs of labor, parts, supplies and other items, which may increase. Therefore, unless otherwise stated in a Schedule A, the charges stated in that Schedule "A", less any amount(s) included for insurance charges, will be adjusted to reflect such cost increases. Each increase in the stipulated price index from the base index set out in any Schedule "A" will result in a Fixed Charge adjustment equal to 100% of such increase and a Mileage and Hourly Charge adjustment of 100% of such increase. Such adjustment shall be effective on January 1 and July 1 based upon the latest published index available at the time of the increase. Adjustments to the Fixed Charge will be rounded to the nearest whole cent. Adjustments to the Mileage and Hourly Charges will be rounded to the nearest one-tenth cent. In the event the index stipulated on any Schedule "A" shall be discontinued, Lessor shall substitute another comparable cost adjustment index.

**13. DEFAULT:**

**(a) Customer's Default:** Each of the following events shall constitute an "Event of Default" hereunder: (i) Customer fails to pay when due any installment of Fixed Charges, Mileage Charges, Refrigeration Hourly Charges, Adjusted Charges, or any other amount due under this Agreement; (ii) Customer otherwise fails to perform any of the covenants, conditions, provisions or terms of this Agreement or any schedule relating thereto; (iii) Customer fails to maintain, use or operate any trailer in compliance with applicable law and such failure is reasonably likely to result in either material civil and/or criminal sanctions against Lessor or Customer or otherwise have a negative impact on Lessor's rights, title or interest in this Agreement or a trailer leased hereunder; (iv) a material inaccuracy in any representation by Customer (including any false or materially misleading representation or warranty) in any credit application or financial statement, including any omission of any substantial contingent or unliquidated liability or claim against Customer; (v) the failure by Customer generally to pay its debts as they become due or its admission in writing of its inability to pay the same; (vi) Customer enters into any transaction of merger or consolidation, unless Customer shall be the surviving entity (such actions being referred to as an "Event"), unless the surviving entity is organized and existing under the laws of the United States or any state, and prior to such Event: (A) such entity executes and delivers to Lessor (1) an agreement satisfactory to Lessor, in Lessor's sole discretion, containing such entity's effective assumption, and its agreement to pay, perform, comply with and otherwise be liable for, in a due and punctual manner, all of Customer's obligations having previously arisen, or then or thereafter arising, under this Agreement, and (2) any and all other documents, agreements, instruments, certificates, opinions and filings reasonably requested by Lessor; and (B) Lessor is reasonably satisfied as to the creditworthiness of such entity, and as to such entity's conformance to the other standard criteria then used by Lessor when approving transactions similar to the transactions contemplated in this Agreement; (vii) Customer ceases to do business as a going concern, liquidates, or dissolves; (viii) Customer sells, transfers, or otherwise disposes of all or substantially all of its assets or property; (ix) if Customer is privately held and effective control of Customer's voting capital stock/membership interests/partnership interests, issued and outstanding from time to time, is not retained by the present holders (unless Customer shall have provided thirty (30) days' prior written notice to Lessor of the proposed disposition and Lessor shall have consented thereto in writing); (x) if Customer is a publicly held corporation and there is a material change in the ownership of Customer's capital stock, unless Lessor is satisfied as to the creditworthiness of Customer and as to Customer's conformance to the other standard criteria then used by Lessor for such purpose immediately thereafter; (xi) there occurs an anticipatory repudiation under this Agreement or a default or anticipatory repudiation under any guaranty executed in connection with this Agreement; (xii) Customer shall suffer a material adverse change in its financial condition from the date hereof, and as a result thereof Lessor deems itself or any of its trailers to be insecure; (xiii) Customer defaults under any other obligation Customer owes to Lessor; (xiv) Customer or any

guarantor of this Agreement or any partner of Customer if Customer is a partnership shall cease doing business as a going concern or make an assignment for the benefit of creditors; (xv) Customer or any guarantor of this Agreement or any partner of Customer if Customer is a partnership shall voluntarily file, or have filed against it involuntarily, a petition for liquidation, reorganization, adjustment of debt, or similar relief under the federal Bankruptcy Code or any other present or future federal or state bankruptcy or insolvency law, or a trustee, receiver, or liquidator shall be appointed of it or of all or a substantial part of its assets; (xvi) Customer or any guarantor of any of Customer's obligations hereunder shall be in breach of or in default in the payment or performance of any obligation owing to any bank, lender, lessor or financial institution, howsoever arising; or (xvii) any individual Customer, guarantor of this Agreement, or partner of Customer if Customer is a partnership shall die.

**(b) Lessor's Remedies:** Upon the occurrence of any Event of Default and at any time thereafter, Lessor may (at its sole discretion) exercise any one or more of the following remedies: (i) proceed at law or in equity to enforce specifically Customer's performance or to recover damages; (ii) declare this Agreement in default, and cancel this Agreement or any Schedule "A" hereto, or otherwise terminate Customer's right to use the trailers and Customer's other rights, but not its obligations, hereunder and Customer shall immediately assemble, make available and, if Lessor requests, return the trailers to Lessor in accordance with the terms of this Agreement; (iii) enter any premises where any trailer is located and take immediate possession of and remove (or disable in place) such trailer (and/or any unattached parts) by self-help, summary proceedings or otherwise without liability; (iv) use Customer's premises for storage without liability for rent (subject to applicable law); (v) retain possession of any trailer already in its possession, and thereafter give the written notice stipulated in paragraph 13(d) below; (vi) sell, re-lease or otherwise dispose of any or all of the trailers, whether or not in Lessor's possession, at public or private sale, with or without notice to Customer, and apply or retain the net proceeds of such disposition, with Customer remaining liable for any deficiency and with any excess being retained by Lessor; (vii) enforce any or all of the preceding remedies with respect to any related collateral, and apply any deposit or other cash collateral, or any proceeds of any collateral, at any time to reduce any amounts due to Lessor; (viii) demand and recover from Customer all damages and other payments whenever the same shall be due; and (ix) exercise any and all other remedies allowed by applicable law, including the Uniform Commercial Code ("UCC"). Regardless of whether Lessor exercises any of the above remedies or declares a default under this Agreement, Customer will be responsible to Lessor for, and will indemnify and hold Lessor harmless from, all damages, liabilities and claims resulting from Customer's breach of any of the terms of this Agreement. Lessor's repossession of trailers shall not in and of itself be considered a cancellation of this Agreement. Notwithstanding such repossession, all charges due under this Agreement shall continue to accrue until this Agreement is cancelled, terminates, or expires.

**(c) Calculation of Damages:** If an Event of Default occurs, if Lessor recovers the trailers and disposes of them by a lease or elects not to dispose of the trailers after recovery, upon demand, Customer shall pay to Lessor an amount equal to the sum of (i) any accrued and unpaid Fixed Charges, Mileage Charges, Refrigeration Hourly Charges, Adjusted Charges, and any other charges due under this Agreement as of the date Lessor recovers possession of the Trailers, plus (ii) the present value as of such date of the total Fixed Charges for the trailers multiplied by the number of weeks and/or months remaining as of that date to the expiration of the stated term of this Agreement, including miles guaranteed but not billed and paid by Customer, minus (iii) either, as applicable, (A) the present value, as of the commencement date of the re-lease of the trailers for the remainder of the stated term of this Agreement and any applicable Schedule "A" and otherwise upon substantially similar terms and conditions, of the re-lease rent payable for that period, commencing on such date, or (B) the present value, as of that certain date which may be determined by taking into account Lessor's having a reasonable opportunity to remarket the trailers, of the "market rent" for such trailers (as computed pursuant to UCC Article 2A) in the continental United States on that date, computed for that period, commencing on such date, for a term equivalent to the remainder of the stated term of this Agreement and any applicable Schedule "A" and otherwise comparable to the terms and conditions of this Agreement; provided, however, Customer acknowledges that if Lessor is unable after reasonable effort to dispose of all of the trailers by re-leasing them for that remaining term at a reasonable price and pursuant to other reasonable terms and conditions, or the circumstances reasonably indicate that such an effort will be unavailing, the "market rent" in such event will be deemed to be $0.00, but in the event that Lessor does eventually re-lease or otherwise dispose of the trailers, it will apply the net proceeds of such disposition, to the extent received in good and indefeasible funds, as a credit or reimbursement, as applicable, in a manner consistent with the applicable provisions of UCC Article 2A. Any amounts discounted to present value shall be discounted at the rate of three percent (3%) per annum, compounded annually.

**(d) Cancellation; Costs of Enforcement:** A cancellation of this Agreement or any Schedule "A" hereof shall occur only upon written notice by Lessor to Customer. If an Event of Default occurs with respect to this Agreement or any related schedule, Customer shall also be liable for all of the following ("Enforcement Costs"): (i) all unpaid rent due before, during or after exercise of any of the foregoing remedies, and (ii) all reasonable legal fees (including consultation, drafting notices or other documents, expert witness fees, sending notices or instituting, prosecuting or defending litigation or arbitration) and other enforcement costs and expenses incurred by reason of any default or

Event of Default or the exercise of Lessor's rights or remedies, including all expenses incurred in connection with the return or other recovery of any trailers in accordance with the terms of this Agreement or in placing such trailers in the condition required hereby, or the sale, re-lease or other disposition (including but not limited to costs of transportation, possession, storage, insurance, taxes, lien removal, repair, refurbishing, advertising, commissions, and brokers' fees), and all other pre-judgment and post-judgment enforcement related actions taken by Lessor or any actions taken by Lessor in any bankruptcy case involving Customer, the trailers, or any other person. Late charges and interest shall accrue with respect to any amounts payable under this paragraph 13 for as long as such amounts remain outstanding, and shall be paid by Customer upon demand. No right or remedy is exclusive and each may be used successively and cumulatively. Any failure to exercise the rights granted hereunder upon any default or Event of Default shall not constitute a waiver of any such right. The execution of a schedule relating to this Agreement shall not constitute a waiver by Lessor of any pre-existing default or Event of Default. With respect to any disposition of any trailers or collateral pursuant to this paragraph 13, (A) Lessor shall have no obligation, subject to the requirements of commercial reasonableness, to clean-up or otherwise prepare the same for disposition, (B) Lessor may comply with any applicable law in connection with any such disposition, and any actions taken in connection therewith shall not be deemed to have adversely affected the commercial reasonableness of any disposition thereof, (C) Lessor may disclaim any warranties in connection with any such disposition, and (D) Customer shall remain responsible for any deficiency remaining after Lessor's exercise of its remedies and application of any funds or credits against Customer's obligations under this Agreement, and Lessor shall retain any excess after such application.

**14. RETURN OF TRAILERS – HOLDING OVER:** Upon expiration, termination, or cancellation of the Agreement as to any trailer, Customer will return the trailer to Lessor's Return Branch Location designated on the applicable Schedule "A", or such other location as designated by Lessor. Except for normal wear as defined in Lessor's Normal Wear Schedule executed in connection herewith, each trailer will be in the same condition as when received by Customer, with all accessories and components intact, whether installed as of the Delivery Date or later installed pursuant to paragraph 11 herein above or as otherwise approved and accepted by Lessor. Customer shall be responsible for removal of all decals, and will be charged for all repainting costs resulting from damages, cosmetic or otherwise, caused by such removal. If a trailer is not returned in such condition, Lessor may repair the trailer and obtain reimbursement for such repairs from the Customer or recover the diminution in value of the trailer. In the event that Customer fails to return a trailer for any reason after the expiration, termination, or cancellation of the lease term, all charges under this Agreement shall continue to accrue, and Lessor shall have the right, without notice to Customer, to increase those charges at any time until such trailer is returned. In the event Lessor is required to make repairs to a trailer in order to return it to the same condition as when received by Customer, the Customer shall be obligated to continue paying all charges relating to such trailer until all such repairs have been completed and such trailer is available for reletting.

If Customer, with Lessor's prior written consent which may be withheld for any reason, holds over possession of any trailer upon the expiration, termination, or cancellation of this Agreement, the term of such holdover shall, unless otherwise agreed in writing, be no more than day to day and shall be terminable at will by either Lessor or Customer. Such holdover shall be otherwise subject to the terms and conditions of this Agreement, including Lessor's right to immediately increase all charges due under this Agreement at any time upon written notice.

**15. LIABILITY OF LESSOR; WARRANTIES:** Lessor will not be liable for failure to supply any trailer, repair any disabled trailer or otherwise perform the terms of this Agreement if the failure results from fire, riot, strike, labor strife, Acts of God, acts of government, war or delay in the receipt of trailers or parts or from any other cause beyond Lessor's control. During such period of a failure to supply, service, or repair any trailer only, the charges specified in the related Schedule "A" will abate and the term of this Agreement will be extended for the period of abatement. If Customer is required to secure other trailers during that period, Lessor will not be liable for charges incurred by Customer for those trailers.

**EXCEPT AS OTHERWISE PROVIDED BY THIS AGREEMENT, LESSOR, NOT BEING THE MANUFACTURER OF ANY TRAILER NOR THE MANUFACTURER'S AGENT, HEREBY EXPRESSLY DISCLAIMS AND MAKES NO EXPRESS OR IMPLIED WARRANTY AS TO ANY MATTER INCLUDING, WITHOUT LIMITATION, THE CONDITION OF THE TRAILERS UPON DELIVERY TO CUSTOMER, THEIR MERCHANTABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE. IN ANY EVENT, LESSOR WILL NOT BE LIABLE TO CUSTOMER OR ANY THIRD PARTY FOR ANY DIRECT, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION, LOSS OF DRIVER'S TIME, LOSS OR INTERRUPTION OF OR DAMAGE TO BUSINESS OR PROFITS, OR FOR OTHER DAMAGES OF ANY NATURE CAUSED BY INTERRUPTION IN SERVICE OR AVAILABILITY OF ANY TRAILER PROVIDED BY LESSOR UNDER THIS AGREEMENT.**

**16. SUBORDINATION:** It is agreed that the rights of the Customer under the Agreement, including Customer's right to possession of the trailers, are subject and subordinate to any lien given by the Lessor to secure indebtedness on



the trailers leased herein, and to the rights of the owner of the trailers. Lessor's assignment of this Agreement shall not release Customer from any of its obligations hereunder and any assignee hereof shall be entitled to all rights of Lessor hereunder. Customer hereby further acknowledges that if Lessor, for the purposes of financing the trailer or for any other financing purposes, assigns its interest under this Agreement, Lessor's assignee shall not assume any of the obligations of the Lessor hereunder. In consideration of the assignee advancing funds to Lessor for financing purposes, Customer agrees, upon notification by assignee, to pay directly to assignee amounts equal to Lessor's financing obligations out of amounts due and owing Lessor or to become due and owing under this Agreement. It is further agreed that such amounts to be paid to assignee by Customer shall not in any month exceed the Customer's aggregate fixed charges for any month, as set forth in any Schedule "A" attached hereto. This obligation of Customer shall remain whether or not this Agreement has been terminated by operation of law, any act of the parties, or otherwise. Customer agrees not to assert against assignee, and promises to pay the aforesaid amounts to assignee notwithstanding, any defense, claim or counterclaim whatsoever, whether by breach of this Agreement (or any other agreement to which Lessor and Customer are parties), the exercise of any right or option hereunder, or otherwise, which it may or might have now or hereafter against Lessor, its affiliates or any third party. Customer does, however, reserve its right to assert any such defense, claim or counterclaim against Lessor. The balance of Customer's payments not directed to be paid to an assignee shall be paid to Lessor or as otherwise directed by Lessor. Subject to and without impairment of the Customer's leasehold rights in and to the trailers, Customer agrees to hold the trailers and the possession thereof for the assignee to the extent of the assignee's rights therein.

**17. CUSTOMER'S FINANCIAL STATEMENTS:** During the term of this Agreement, Customer will furnish to Lessor, within 45 days after the end of each fiscal quarter, an income statement and balance sheet as of the end of such quarter and, within 90 days after the end of Customer's fiscal year, an income statement and balance sheet certified by a certified public accountant reasonably acceptable to Lessor, and copies of all written information distributed to stockholders. Customer also agrees that if it defaults in any payments hereunder, it will provide Lessor such additional statements of its financial position as Lessor may request. Provided, however, that Customer shall be deemed to have complied with the foregoing requirements if Customer files Forms 10-K and 10-Q with the Securities and Exchange Commission that are publicly available within the time frames set forth above, and all such financial statements (or Forms 10-Q and 10-K) shall fairly present the financial condition and the results of operations of Customer as of the date of and for the period covered by such statements.

**18. ACCIDENTS:** Customer agrees to notify Lessor immediately upon the occurrence of an accident involving a trailer and to provide Lessor promptly with a detailed written report of the accident, along with copies of all reports Customer has provided to the insurance carrier or any governmental agency. Customer shall render all assistance requested by Lessor and the insurance carrier in the investigation or litigation of any claims or suits involving a trailer. Customer agrees to deliver promptly to Lessor and to the appropriate insurance carrier copies of all legal documents received in connection with any proceeding arising out of the ownership, maintenance, use or operation of the trailer.

**19. INDEMNIFICATION:** Customer will indemnify Lessor and its agents, servants and employees and hold them harmless from any and all claims, suits, proceedings, costs, losses, expenses, liabilities (including strict liability) and damages, including but not limited to legal fees and expenses, and court costs, claimed by any person, organization, association or other entity with respect to any and all injuries (including death) or property damage sustained by such party as a result of the act of Customer or any driver, agent, servant or employee of Customer and from any liability imposed upon or assumed by Customer under any Workers' Compensation Act or other employee benefit plan or contract whatsoever. Customer will indemnify Lessor and its agents, servants and employees, and hold Lessor and its agents, servants and employees harmless from any and all claims, suits, proceedings, costs, losses, expenses, liabilities (including strict liability), and damages, including but not limited to legal fees and expenses and court costs, caused or arising out of Customer's failure to comply with the terms and provision of this Agreement or relating to the trailers, or any accessories or equipment furnished to Customer or the care, custody or operation of the trailers, including without limitation, any damage caused by latent and/or other defects whether or not discoverable by Lessor or Customer, and any damages caused by Customer's transportation or handling of any hazardous or toxic materials or substances.

**20. ASSIGNMENT:** Lessor may, without Customer's consent, assign this Agreement. Without Lessor's prior written consent, Customer shall not (a) assign, transfer, pledge, hypothecate, or otherwise dispose of this Agreement or any interest therein, or (b) sublet or lend trailers or permit them to be used by anyone other than Customer or Lessor's employees. Consent by the Lessor to any of the foregoing prohibited acts applies only in the given instance. A transfer or assignment by Customer shall be deemed to have occurred in the event of a merger of Customer, a sale of substantially all the assets of Customer, or the change of voting control of the stock of Customer in a transaction or series of transactions. Any such attempted action by Customer either by voluntary or involuntary act or by operation of law or otherwise, shall constitute an event of immediate default. Neither this Agreement nor Customer's interest therein, is assignable or transferable by operation of law. If Customer is adjudged a bankrupt or makes an assignment for the benefit of creditors, or a receiver is appointed for Customer, this Agreement shall not be treated as

an asset of Customer and Lessor may exercise any and all remedies provided in this Agreement.

**21. GENERAL:** This Agreement is a lease only and Customer acquires no title or ownership rights to any trailer unless otherwise specifically provided in a Schedule A relating to that trailer. In accordance with Internal Revenue Code Sec. 7701(b), Customer acknowledges that it will not be treated as owner of the accessories, equipment, or trailers for Federal income tax purposes. This Agreement and the Schedules which are executed now or at any later date make up the entire agreement between the parties; there are no oral agreements affecting this Agreement, and this Agreement supersedes any prior agreements between the parties as to the trailers being leased. All Schedules executed now or at a later date are part of this Agreement and are incorporated by reference. If there is any conflict between the terms of this Agreement and any Schedule hereto, the terms of the Schedule shall control. Customer acknowledges that no waiver, amendment, re-lease or modification of this Agreement shall be established by conduct, custom, or course of dealing, but solely by an instrument in writing signed by duly authorized representatives of both parties. Customer agrees to execute and deliver to Lessor, upon Lessor's request, such documents and assurances as Lessor deems necessary or advisable for the confirmation or perfection of this Agreement and Lessor's rights hereunder, including such documents as Lessor may require for filing or recording. This Agreement is binding on the parties, their successors, legal representatives and permitted assigns. Any notice required hereunder must be written and sent by certified mail (i) if to Lessor, to Lessor's address shown on page one, with a copy to Lessor's corporate headquarters; and (ii) if to Customer, either (A) to its address shown on page one, (B) to any other mailing address provided by Customer to Lessor, or (C) to Customer's Statutory Agent. The titles of the various paragraphs are solely for convenience of the parties and will not be used to explain, modify, amplify or aid in interpretation of the terms. Failure of Lessor to declare any default or exercise any right under this Agreement will not waive the default and Lessor will have the right at any time thereafter to declare that default and take any action permitted by this Agreement or by law. Any provision of this Agreement prohibited by law will be deemed amended to conform to such law without in any way invalidating or affecting the remaining provisions. Customer hereunder hereby waives presentment, demand, notice of dishonor, protest and notice of non-payment and protest. Each person signing below warrants that he/she is duly authorized to sign on behalf of that party. This Agreement is deemed to have been made in, and will be construed in accordance with and governed by the internal laws of, and not the laws of conflict of, the State of Ohio. **Customer hereby waives any right to a jury trial with respect to any matter arising under or in connection with this Agreement.**

**22. AGREED LEGAL FORUM: The parties have agreed that any claim or controversy relating directly or indirectly to this Agreement shall be resolved only before a state or federal court in Ohio selected by Lessor and nowhere else.** Customer expressly agrees that such courts shall have personal jurisdiction over Customer and Customer expressly consents to such courts' exercise of that jurisdiction. Customer hereby intentionally and knowingly waives any defense of lack of jurisdiction, improper venue, inconvenient forum and benefit of any other law permitting it to avoid the forum selection provision of this paragraph. Customer acknowledges that its agreement to the provisions of this paragraph is a specific inducement for Lessor to enter into this Agreement and that Lessor will rely upon that inducement. But for the inclusion of this forum selection provision, Lessor would not enter into this Agreement and Customer should not enter into this Agreement if it does not intend to honor the provisions of this paragraph. Customer's initiation of legal proceedings in any other forum shall be a material breach of this Agreement. Customer agrees to indemnify Lessor against and hold it harmless from, any cost or expense, including reasonable legal fees and expenses and court costs, resulting from Customer's commencement of any legal action or proceeding other than in a state or federal court in Ohio. Notwithstanding the foregoing, Lessor may, at its sole option and upon Customer's default, initiate legal proceedings in any forum where the trailers are located in order to facilitate repossession of the trailers.

AGREED TO:

| **Customer:** | **Lessor:** |
|---|---|
| | STAR LEASING CO. |
| By: _[signature]_ | By: _[signature]_ |
| Printed Name: Baruch Guzelgul | Printed Name: R. Steven Jackson |
| Title: President | Title: President / CEO |
| DATE SUBMITTED: 4/28/15 | DATE ACCEPTED: 5/26/15 |