Debtor will reject the following executory contracts and unexpired leases:

Master Lease with Contract Leasing Corporation

RedWing Technology Corporation, an Arizona Corporation ("Gridline")

# EXHIBIT "I"

# FULL SERVICE TRAILER LEASE AGREEMENT
# OF
# CONTRACT LEASING CORP.

TRAILER LEASE AGREEMENT made this __1/28/15__, by and between **CONTRACT LEASING CORP.,** having its principal office at 1570 South Washington Avenue, Piscataway, New Jersey 08854 ("Contract") and **MONSEY ONE INC.,** a New Jersey corporation having its principal office at 18 Pulaski St., Bayonne, NJ 07002 ("Lessee").

IN CONSIDERATION of the mutual covenants herein contained, and intending to be legally bound, Contract and Lessee hereby agree as follows:

1. LEASING OF TRAILERS. Contract agrees to lease to lessee, and Lessee agrees to lease from Contract, the trailers described in Schedule A attached hereto and made a part hereof, as now constituted or as supplemented or amended from time to time by written agreement of the parties. Leased trailers shall hereinafter be referred to collectively as "Trailers" or singularly as "Trailer".

2. TERM. The Lease term for each Trailer shall commence on the day the Trailer is made available to Lessee, and shall terminate on the date specified as the "Expiration Date" in Schedule A. This Lease is irrevocable for the entire term, unless earlier terminated in accordance with the provisions hereof. Should Contract permit Lessee to continue to use one or more of the Trailers beyond the expiration or earlier termination of the Lease term, such permissive use shall not be construed as a renewal of the Lease term nor as a waiver by Contract of any of its rights hereunder. The obligations assumed by Contract under this Lease shall not survive the expiration or earlier termination of the Lease term.

3. RENTAL AND PAYMENTS. For each Trailer, Lessee shall pay rental charges to Contract at the rates specified in Schedule A. Rental charges for a Trailer shall accrue daily throughout the Lease term, beginning the earlier of the date the Trailer is accepted by Lessee or five days after Lessee is notified that the Trailer is available for acceptance. Rentals shall be paid monthly, in advance, the first day of each month, except for the first

month's rentals which shall be paid on the first day of the following month. All amounts payable hereunder, with the exception of rentals, shall be due upon presentation of Contract's invoice. All payments shall be made to Contract at its principal office, unless Contract otherwise directs in writing. Except as specifically provided to the contrary hereinafter, Lessee's obligation to pay Trailer rentals shall be absolute and unconditional, and shall not be subject to any abatement or recoupment whatsoever. To secure the performance and payment of all indebtedness, obligations and liabilities of Debtor to

Secured Party of whatever kind, whether previously, contemporaneously, or subsequently incurred or created, whether direct or acquired from third parties, whether contingent or fixed, and whether of the same or different classes (including, without limiting the generality of the foregoing, all indebtedness, obligations and liabilities arising out of or relating to (i) advances, payments, loans, endorsements, guaranties, extensions of credit, financial accommodations and/or benefits granted or extended by Secured Party to or for the account of Debtor; (ii) notes, security agreements, equipment leases and/or rental agreements, installment sale contracts, bailment agreements, guaranties, and/or any other present or future agreements between Debtor and Secured Party, and/or (iii) expenses, charges, commissions and/or interest owing by Debtor to Secured Party or chargeable to Debtor by Secured Party) and all extensions, renewals and/or modifications of the foregoing (collectively, the "Obligations"), Debtor does hereby assign, transfer, pledge and grant to Secured Party a security interest/lien in/upon all property listed on any Schedule to this Agreement, and in all goods, inventory, equipment, accounts, chattel paper, contract rights, general intangibles, fixtures and other property, wherever located, now or hereafter belonging to Debtor or in which Debtor has any interest, and in all proceeds, additions and accessions of and/or to all of the foregoing (collectively, the "Collateral"). Debtor and Secured Party acknowledge that Secured Party may (but shall not be obligated to) make future loans or extensions of credit to Debtor, refinance existing Obligations of Debtor, or purchase from third parties loans or indebtedness of Debtor, and Secured Party and Debtor agree that the Collateral shall be security for any and all such indebtedness, the same being within the contemplation of the parties as of the date hereof. Should Lessee fail to pay when due any rental or any other amount payable hereunder, the amount past due shall bear interest at the rate of one and one half (1-1/2%) percent per month until paid in full.

4. RENTAL ADJUSTMENTS. For each one (1%) percent point increase or decrease in the "Revised Consumer Price Index for Urban Wage Earners and Clerical Workers" as published by the United States Bureau of Labor and Statistics, using a 1967 base period (hereinafter "Index"), the rental and mileage rates specified in Schedule A shall be similarly increased or decreased by one (1%) percent. Adjustments shall be made semiannually, shall be effective on the first day of each half year period, and shall be made based upon the last Index published prior to such effective date. The parties agree that the Base Index number for each Trailer shall be the last Index number published prior to the date the Trailers are made available to Lessee. If the Index is discontinued, the parties will designate another cost adjustment index.

5. ADDITIONAL RENTALS. In addition to the rental provided above, Lessee shall pay to Contract a mileage charge at the rate specified in Schedule A. Mileage shall be determined by hubodometer installed by Contract. Lessee shall report the mileage for each Trailer and pay the applicable mileage charges on a semiannual basis. In the event any hubodometer fails to function properly, Lessee shall notify Contract immediately. For any period(s) that a hubodometer is not functioning properly, mileage shall be estimated by prorating the average mileage reported for all Trailers during the immediately preceding quarter.

6. DELIVERY AND ACCEPTANCE. All Trailers shall be made available for acceptance by Lessee at Contract's facilities, or at such other location as may be designated by Contract. Upon Lessee's receipt of Contract's notice that a Trailer is available for acceptance, Lessee shall promptly arrange to inspect and accept the Trailer. Lessee's acceptance of a Trailer shall conclusively establish that the Trailer is in good and efficient operating order, condition and appearance ( except as otherwise noted on a Trailer inspection report signed by Contract ), and that Lessee unconditionally accepts the Trailer "as is" and subject to the provisions of this Lease.

7. LOCATION AND INSPECTION. During the Lease term, Lessee shall permit Contract's duly authorized representative to examine and to inspect any of the Trailers during normal business hours. Lessee shall not permit any Trailer to be moved beyond the territorial limits of the continental United States. For purposes of this Lease, Lessee shall be conclusively presumed to be in possession of a Trailer from the moment the Trailer is accepted by Lessee until the Trailer is properly returned to Contract.

8. USE AND OPERATION. Lessee shall not permit the Trailer to be used, operated, maintained, or stored improperly, carelessly, in violation of this Lease, in any manner that would result in damage to a Trailer nor in a manner otherwise than for the uses contemplated by the manufacturer thereof. Lessee shall not permit any unlawful use or handling of the Trailers and shall, at its expense, comply with all laws of all governments or governmental agencies which in any way affect or are applicable to the use, operation, storage or possession of the Trailers. Lessee shall indemnify and hold Contract harmless from and against any and all fines and penalties that may arise from the violation or infringement of any such laws.

9. TAXES AND LICENSES. Contract shall register and license the Trailers under the motor vehicle registration laws of the state (s) designated on Schedule A, and shall pay the registration and licensing fees for the Trailers; provided, however, that if the registration or licensing fees increase above current levels, Lessee's monthly rental charges shall be increased by 1/12 of the amount of the increase. Lessee assumes responsibility for all additional licenses, permits, inspections and other certificates as may be required by law or otherwise for Lessee's lawful use and operation of the Trailers; provided, however, that all certificates of registration for the Trailers shall be applied for and issued in the name of Contract or Contract's designee. Lessee assumes responsibility for, and shall pay when due, all taxes and governmental charges, howsoever designated, now or hereafter imposed upon the leasing, use, operation or possession of the trailers or rental payable hereunder, together with all related interest and penalty charges, but excluding net income taxes assessed against Contract. Upon Contract's request, Lessee shall provide Contract with evidence of payment of the taxes and/or charges.

10. IDENTIFICATION OF INTEREST. Contract reserves the right to attach, in one or more locations upon each Trailer, identifying marks, decals, signs or other forms of notice indicating Contract's interest in the Trailer. Lessee shall not remove, obscure,

deface or obliterate any such identifying marks or notice, nor permit or suffer any other person to do so.

11. ADDITIONAL TRAILERS. During the term of this Lease, Lessee may rent Additional Trailers from Contract ( hereinafter "Additional Trailers" ) on a daily, weekly or monthly basis, subject to the availability of trailers in Contract's rental fleet. For each Additional Trailer rented by Lessee, Lessee shall pay rental charges to Contract at a rate equal to Contract's then existing Lease rental rate for the Trailers, plus fifteen (15%) percent. All other terms and conditions governing Lessee's renting of Additional Trailers from Contract shall be as set forth herein, unless otherwise provided on a rental agreement entered into by the parties.

12. MAINTENANCE AND REPAIR. Contract shall provide maintenance servicing for the Trailers by performing preventive maintenance and maintenance occasioned by normal wear and tear whenever a Trailer is made available to Contract within the service region designated on Schedule A for such Trailer; provided, however, that as a condition to Contract's obligation hereunder, Lessee shall make each Trailer available to Contract for preventive maintenance servicing at least one time during each calendar year at the location designated on Schedule A as the home base for such Trailer. Contract's obligation hereunder extends to the maintenance and the replacement of all parts, accessories and tires, when required due to normal wear and tear. Lessee shall be responsible for, and shall bear the expense of, all damage repairs and repairs required due to Lessee's failure to make the Trailers available to Contract for maintenance as stated above, and all shuttling of the Trailers to and from repair facilities. In addition, Lessee specifically agrees to check the hub oil level of each Trailer daily and to add oil as required. Contract shall ( upon Lessee's request and for Lessee's account ) perform the repairs for which Lessee is responsible hereunder whenever a Trailer is made available to Contract at a location within the service region for such Trailers. In the event that Contract performs repairs for which Lessee is responsible hereunder, Lessee shall pay Contract for such services at Contract's then current rates for labor and parts. Contract shall have the right to inspect all maintenance or repairs performed on the Trailers by anyone other than Contract, and to correct, at Lessee's expense, all defects in materials or workmanship that, in Contract's reasonable judgment, result from the performance of such maintenance or repairs in an improper manner. If Lessee replaces any parts, accessories and tires, such replacement item (s) shall be comparable in quality to the item (s) being replaced as of the time when the Trailer was first accepted by Lessee, and shall become the property of Contract immediately upon attachment to the Trailer.

13. ALTERATIONS. Lessee shall not make nor permit any substantial changes in, or improvements to, the Trailers, nor remove therefrom ( except for purposes of replacement ) any part, accessory or tire without first obtaining the written consent of Contract. Any changes in, or improvements to, the Trailers shall become the property of Contract; provided, however, that at the option of Contract, Lessee shall, at its expense, restore the Trailer to its original condition prior to returning the Trailer to Contract. A Trailer returned with any part, accessory or tire missing shall continue to be

considered a leased Trailer until the missing item has been returned or the replacement cost therefor has been paid.

14. SUBSTITUTE TRAILERS. In the event that Contract shall, through no fault of Lessee, retain a Trailer out-of-service for more than two business days in order to perform Contract's maintenance obligation, then Contract shall furnish Lessee with a substitute trailer within two (2) business days of Lessee's request therefore (hereinafter "Substitute Trailer"). A Substitute Trailer shall not be furnished by Contract when a Trailer is held out-of-service for damage repairs. The Substitute Trailer shall be reasonably comparable in loading capacity to the out-of-service Trailer, and shall be made available for acceptance by Lessee where a suitable Trailer for substitution is available. So long as Contract retains the out-of-service Trailer for servicing, Lessee shall not be obligated to pay any additional rental for the Substitute Trailer. Lessee shall, however, continue to pay the rental for the out-of-service Trailer. Contract shall notify Lessee when an out-of-service Trailer is available for return to Lessee's service. Lessee shall pick up such Trailer, and shall return the Substitute Trailer to Contract's facility from where originally accepted, within five (5) business days from the date of Contract's notice. In the event that Lessee fails to properly return a Substitute Trailer within the specified period, then the Substitute Trailer shall be determined to be an Additional Trailer as of the sixth business day from the date of Contract's notice, until properly returned; and Lessee shall pay the rental charges applicable to Additional Trailers as provided above. In the event that Lessee does not request a Substitute Trailer when entitled to do so, or if Contract is unable to provide a Substitute Trailer, then Lessee's obligation to pay rental for the out-of-service Trailer shall abate as of the third business day after the day the Trailer is accepted by Contract for servicing.

15. RETURN. Upon the termination of this Lease, Lessee shall, at its expense, return the Trailer(s) to the facility of Contract where originally accepted, or to such other facility as may be designated by Contract. The Trailers shall be returned in good and efficient operating order, and in the same condition and appearance as when accepted by Lessee (reasonable wear and tear alone excepted). The rights created for Contract and the obligations assumed by Lessee under this Lease shall continue until the Trailers have been returned as required hereunder or, if a Trailer is returned in damaged or otherwise unsatisfactory condition, until the Trailer has been properly repaired and restored, at Lessee's expense, to the condition required hereunder; provided, however, that during any such period of continuance the rental charges payable by Lessee to Contract for each such Trailer shall be at the rate of Contract's then prevailing daily rental rate.

16. RISK OF LOSS. Lessee shall bear the risk of all direct, indirect or consequential loss, damage or deprivation of use, of the Trailers in Lessee's possession. If a Trailer is lost, stolen, or otherwise disappears, or if a Trailer is damaged to such an extent that it can not, in the opinion of Contract economically be restored to good operating order, condition and appearance, Lessee shall promptly pay to Contract an amount equal to the replacement value of the Trailer determined as of the date first missing or damaged. As used throughout this Lease, the phrase "replacement value" shall mean the depreciated

value of the Trailer as reflected on Schedule A. Upon receipt by Contract of Lessee's payments of the replacement value and for all rental and other Lease charges accrued through the date of Contract's receipt of such payments, Lessee's obligation to pay rental shall cease and terminate with respect to the missing or damaged Trailer.

17. INDEMNITY AND INSURANCE. Lessee shall, at its expense, defend, indemnify and hold harmless Contract, its employees and agents from and against all claims, demands, liability, costs and expenses whatsoever ( including attorneys fees ) arising or alleged to have arisen out of, or in any manner connected with, the condition, use or operation of the Trailers in Lessee's possession. Lessee shall purchase and maintain policies of insurance in forms and with insurance companies that are satisfactory to Contract. The insurance policies shall insure Lessee and Contract as their respective interests may appear as follows: (a) comprehensive general liability insurance covering liability for bodily injury or death, and property damage, with limits not less than $1,000,000 per occurrence; (b) automobile liability insurance covering liability for bodily injury or death, and property damage, with limits not less than $1,000,000 per occurrence; (c) all risks property damage or loss insurance covering each Trailer at its replacement value and designating Contract as loss payee; and (d) excess all risk insurance coverage in the amount of $5,000,000 per occurrence. The insurance policies shall, by suitable endorsement, name Contract as an additional assured and shall provide that: (a) the respective coverage shall be considered primarily as against any insurance coverage that may be provided by Contract; and (b) Contract shall receive not less than thirty (30) days written notice before cancellation or material alteration of the policy. Promptly after the execution of this Lease, Lessee shall furnish Contract with certificates of insurance evidencing the above required insurance coverages. The maintenance of insurance by Lessee shall not be deemed nor construed to suspend, limit or modify Lessee's other obligations under this Lease.

18. NOTIFICATION OF ACCIDENT OR LOSS. Lessee shall, at its expense, promptly notify Contract of each accident and each occurrence of loss involving a Trailer in Lessee's possession. Lessee's notice shall describe the time, place and nature of the accident or loss, the extent of any Trailer damage resulting therefrom, the names and addresses of all involved parties, a copy of any police report and such other information as may be known. Lessee shall promptly advise Contract of all notices or documents received by Lessee in connection with any claim relating to the Trailers.

19. DISCLAIMER OF WARRANTIES. Contract hereby disclaims, and Lessee hereby releases Contract from, ANY AND ALL REPRESENTATIONS AND WARRANTIES, EITHER EXPRESSED OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING AND WITHOUT LIMITATION (A) THE DESIGN, CONDITION, OPERATION, MERCHANTABILITY OR FITNESS FOR USE OF THE TRAILERS; (B) THE FITNESS OF THE TRAILER FOR ANY PARTICULAR USE OR PURPOSE OF LESSEE; AND (C) THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE TRAILERS. Contract shall not under any circumstances by liable to Lessee (or anyone claiming through Lessee) for special, consequential or incidental damages.

20. FORCE MAJEURE. Contract shall not be liable for any failure to perform any obligation hereunder when prevented from so doing by act of God, war, fire, riot, or civil disturbance, snow or flood, strikes or other labor trouble, or by other conditions beyond the control of Contract. No delay in the performance of Contract's obligation to make new Trailers available for acceptance by Lessee, if caused by the manufacture of the Trailers, shall excuse Lessee from performing its obligation to accept the Trailers under this Lease when made available.

21. EVENTS OF DEFAULT. Time is of the essence for this Lease, and the occurrence of one or more of the following shall constitute an event of default: (a) Lessee fails to pay when due any rental, or any other payment becoming due hereunder; (b) Lessee fails to perform any other obligation assumed by Lessee under this Lease for more than ten (10) days after Contract has requested Lessee to perform; (c) Lessee or any Guarantor ( i ) becomes insolvent, ( ii ) commits an act of bankruptcy, ( iii ) becomes subject to any voluntary or involuntary bankruptcy proceedings, ( iv ) makes an assignment for the benefit of creditors, ( v ) appoints or submits to the appointment of a receiver for all or any of its assets, ( vi ) admits in writing its inability to pay its debts as they become due, or ( vii ) enters into any type of voluntary or involuntary liquidation; (d) Lessee defaults under any other lease with Contract or any corporation affiliated with Contract; or (e) any letter of credit, guaranty or other security given to secure the performance of this Lease shall expire, terminate or become worthless in the opinion of Contract.

22. REMEDIES UPON DEFAULT. In the event of any default by Lessee, Contract may, at its option and without demand or notice to Lessee, do one or more of the following: (a) pay all amounts, or perform or cause to be performed all obligations, required to be paid or performed by Lessee hereunder, and recover from Lessee, as additional rental, all amounts so paid or the reasonable value of all services so performed; (b) take immediate possession of the Trailers in accordance with the provisions of Paragraph 20 herein; (c) if the Trailers are leased for a stated term, declare the entire balance of rentals for the remainder of the term immediately due and payable by acceleration, and recover such amount as liquidated damages, the reasonableness of such damages being hereby acknowledged by Lessee; or (d) immediately terminate this Lease and Lessee's rights hereunder and require Lessee to immediately return the Trailers to Contract at such locations as Contract may designate. No termination, repossession or other act by Contract after default by Lessee shall relieve Lessee from any of its obligation hereunder. In addition, Lessee shall pay to Contract on demand all fees, costs and expenses incurred by Contract in successfully enforcing its rights hereunder including, without limitation, reasonable attorney's fees. The remedies provided herein in favor of Contract shall not be exclusive, but shall be cumulative and in addition to all other remedies provided in this Lease or existing at law or in equity, any one or more of which may be exercised simultaneously or successively.

23. REPOSSESSION. Should Lessee fail or refuse to promptly return a Trailer to Contract after Contract has made a proper demand therefor, or if Lessee is in default

under this Lease, Contract shall have the right to enter upon any premises where the Trailers may be found to take immediate possession of, and to remove, the Trailers. Should Contract retake possession of a Trailer and should there be at the time of the retaking any other property in, upon or attached to the Trailer, Contract may take possession of such property and hold it in Contract's possession (or at Contract's option in public storage) for the account, and at the expense, of Lessee. Lessee hereby releases and specifically agrees to indemnify and hold Contract harmless from and against any claim or right of action for trespass or damages caused by reason of such entry and removal.

24. NOTICES. Any notice, request, or demand given under this Lease, whether or not required, shall be valid only if in writing and shall be deemed effective three (3) days following its deposit in a United States Post Office if mailed by Certified Mail, return receipt requested, postage prepaid, and properly addressed to the party for whom intended at the address designated above or at such other address as the party may hereafter designate for itself by notice; or if given in any other manner, when actually received.

25. TITLE AND ENCUMBRANCES. This transaction is a lease agreement and not a sale, conditional or otherwise. Lessee shall not acquire hereunder, or by payment of the rental, any right to, or interest in, the Trailers or any part thereof, except the right to possess and use Trailers in accordance with the provisions of this Lease so long, and only so long, as Lessee shall not be in default in the performance of its obligations hereunder. Lessee shall keep the Trailers free from all liens, charges and encumbrances arising in connection with Lessee's use, operation or possession of the Trailers.

26. NON-WAIVER. The failure by either party to require the strict performance of any obligation assumed by the other party hereunder, or the failure of either party to exercise any right or remedy to which it is entitled, shall not constitute a waiver nor cause a diminution of the obligations or rights provided under this Lease. None of the provisions of this Lease shall be held to have been waived by any act or knowledge of the parties, but only by a written instrument executed by the party to be bound thereby. Waiver of any default shall not be a waiver of any other or subsequent default.

27. ASSIGNMENTS. Lessee hereby consents to any assignment of this Lease by Contract. Lessee may not assign this Lease nor any of Lessee's rights or obligations hereunder, either by its own act or by operation of law, without the prior written consent of Contract; and any such attempted assignment shall be void.

28. SUBORDINATION. This Lease is hereby made subordinate to any chattel mortgage, pledge, security agreement, conditional sale contract, lease or like agreement applicable to the Trailers to which Contract is bound.

29. CONSTRUCTION. If any provision of this Lease, or the application thereof, is held by a Court having competent jurisdiction to be invalid or unenforceable under an applicable law, the remainder of this Lease shall not be affected thereby; and to this end

the provisions of this Lease are declared severable. If there is more than one Lessee, the *obligations* under this Lease are joint and several. The laws of the State of New Jersey shall govern the construction of this Lease and the rights and obligations of the parties.

30. INTEGRATED LEASE AGREEMENT. This Lease, including the attached schedules, constitutes the entire agreement between the parties pertaining to the Trailers and the subject matter relating thereto. The terms, covenants, conditions and other provisions of this Lease may hereafter be supplemented, changed, amended, or modified only by a written instrument that specifically purports to do so and is signed by both parties. No agreements, representations, or understandings not specifically contained herein or otherwise reduced to a written instrument signed by both parties, shall be binding upon the parties.

| LESSEE: MONSEY ONE INC | LESSOR: CONTRACT LEASING CORP. |
|---|---|
| By: _____ | By: _____ |
| Printed Name: Baruch Guzelgul | Printed Name: J Barry McGrath |
| Title: Pre | Title: C.F.O. |
| Date: 1-22-15 | Date: 1/28/15 |



# Quotation

| | |
|---|---|
| **Quote #:** | Q-00552-3 |
| **Date:** | 10/31/2017 12:08 PM |
| **Expires On:** | 11/30/2017 |
| **Subscription Term:** | 36 Months |

**Gridline**

15030 N Hayden Rd, Suite 115
Scottsdale, AZ 85260
US

Phone: (855) 470-0545
Fax: (480) 422-1452
Email: sales@gridline.com

**Ship To**
Pinchas Guzelgul
Monsey One Trucking
18 Pulaski Street
Bayonne, NJ 07002
USA
(201) 339-3599 ext. 108
pinchas@monseyone.com

**Bill To**
Monsey One Trucking
18 Pulaski Street
Bayonne, NJ 07002
USA

| SALESPERSON | EXT | EMAIL | DELIVERY METHOD | PAYMENT METHOD |
|---|---|---|---|---|
| Elliott Betley | x | ebetley@gridline.com | Ship | Due on receipt |

| ONE-TIME | | | | |
|---|---|---|---|---|
| **PART #** | **DESCRIPTION** | **QTY** | **UNIT PRICE** | **TOTAL PRICE** |
| GO7-3GATT | GO7 3G GPS Unit for the AT&T Network | 20 | $130.00 | $2,600.00 |
| T-HARNESS | Geotab HD T-Harness | 20 | $35.00 | $700.00 |
| GRID-CONFIG | Gridline Geotab System / Database Configuration and Setup | 1 | $500.00 | $500.00 |
| SPR-INSTALLBAG | Mounting Bracket & Material for GO6/GO7 | 20 | $4.00 | $80.00 |

**ONE-TIME TOTAL**: $3,880.00

| SUBSCRIPTION | | | | |
|---|---|---|---|---|
| **PART #** | **DESCRIPTION** | **QTY** | **MONTHLY UNIT PRICE** | **MONTHLY TOTAL PRICE** |
| GO-MONTHLY HOS | Geotab HOS Only Monthly Service | 20 | $23.00 | $460.00 |
| GRID-EXTWRNTY | Gridline 3 Year Extended Manufacturer Warranty | 20 | $1.00 | $20.00 |

**SUBSCRIPTION TOTAL**: $480.00

**GRIDLINE General Terms**

These Gridline General Terms (the "Agreement") are between Redwing Technology Corporation, an Arizona corporation ("Gridline") and Client, as identified on the specific electronic or written order or quote (to be referred to hereunder as the "Quote") to which these General Terms are attached or incorporated by reference, (singly, "Party" or collectively, "the Parties").  This Agreement takes effect on the date set forth on the Quote (the "Effective Date").

Doc ID: 20171122144119116
Sertifi Electronic Signature

**GENERAL TERMS AND CONDITIONS:**

1. **Purpose**. Gridline agrees to provide to Client the resold third party hardware, software and its related maintenance and support, and third party branded services (collectively, "Product" or "Products") and/or Managed Services (as defined herein) as set forth in the Quote. The Quote is subject to the terms and conditions of this Agreement whether or not referenced on the Quote. If there is any ambiguity or conflict between the terms and conditions of this Agreement and those of the Quote, the terms and conditions of this Agreement shall govern, unless the Quote specifically states it is to control over this Agreement and is executed by both parties. Such modification shall be applicable exclusively to that Quote. As used herein, "Managed Services" means those professional services provided by Gridline as set forth on the Managed Services section of the Gridline website.
2. **Pricing/Payment**.
    1. **Pricing**. The prices charged for Products and Managed Services are set forth in the Quote. All prices are exclusive of taxes, duties, shipping and handling charges. A handling fee may apply when ordering special, non-standard product(s).
    2. **Invoicing/Payment**. Gridline typically does not ship any hardware (including any GPS hardware, mounts, wireless accessories, tablets, phones and cameras) until it has received full payment for such hardware from Client. Unless Client is extended credit by Gridline, full payment for hardware should be provided by Client to Gridline at the same time as the Client's executed Quote. For third party software and its related maintenance and support, third party branded services, and Managed Services, Gridline will invoice Client monthly in advance over the applicable subscription term (each a "Subscription Term") set forth in the Quote. Unless set forth otherwise on the Quote, the Subscription Term shall renew for successive 12 month terms if either party has not sent written notice of non-renewal at least 30 days in advance of the expiration date of the then-current term. Client must pay all undisputed invoices in full within 30 days of the invoice date. All payments must reference the invoice number. Monthly recurring charges for software or services will begin when the GPS units necessary to receive the software or services are installed in the vehicles; provided, however, if the GPS units have not been installed within 30 days of delivery, the monthly recurring charges will begin. The billing cycle for monthly recurring charges shall begin on the first day of each month, with the first month bill reflecting the applicable, pro-rated, first month and the advance billing for the first month.
    3. **Late Payment**. Gridline reserves the right to charge late interest as follows for any late payment: if for monthly recurring charges, a fee of 1.5% of the outstanding balance per month, or the maximum allowed by law, whichever is lower. Client is responsible for all costs of collection, including reasonable attorneys' fees, for any payment default on undisputed invoices. In the event of any late payment, in addition to all other remedies available to Gridline at law and equity, Gridline may decline to make further shipments or suspend use of software or services until payment is made in full of all amounts due (including any interest owed).
    4. **Taxes**. Federal, state and local sales, use and excise taxes and all similar taxes and duties, (excluding taxes based on Gridline's income, assets or net worth), are the sole responsibility of Client. Client may provide Gridline a tax exemption certificate, which will be subject to review and acceptance by Gridline.
3. **Cancellation of Quotes**. Cancellation of a Quote by Client requires the prior written approval of Gridline (which shall not be unreasonably withheld, conditioned or delayed) and, in the case of Quotes including hardware, will only be approved by Gridline if the cancellation request occurs within 5 days of acceptance of the Quote. All cancelled Quotes shall be subject to a cancellation/restocking fee equal to 30% of the fees charged for the cancelled hardware.
4. **Products**.
    1. **Software Licenses/ Use Rights.** If any hardware Product requires software to be integrated into it, Client is responsible for acquiring and maintaining valid software licenses or use rights for each Product and all software used and/or installed on Product, whether installed by Gridline or by any other party or method. For all software purchased, including software that is obtained as a cloud-based right, electronically downloaded and/or considered part of a Product, Client agrees that it will be bound by the third-party license or terms of use agreement (collectively, the "License") governing the use of such software. Unless otherwise stated within this Agreement (including the applicable Quote) or the License, the term of the License begins upon delivery. For all software products that come with a click-thru License that must be accepted prior to install or first use, Client agrees that it will be bound by the License once the click-thru is accepted by Client or, if Client authorizes Gridline or a third party to conduct installation, at the time of Client's first use.
    2. **Internet and Wireless Services.** Whether Client has purchased Internet and wireless access as a resold Product from Gridline or obtained it through another means, (a) Client is responsible for obtaining all necessary Internet access and wireless from a third party vendor and (b) the contractual relationship (the "Access Terms") governing such Internet and wireless access will be directly between Client and the third party service provider(s). If Client has purchased Internet or wireless access as a resold Product from Gridline, then the applicable Access Terms will be either attached to or referenced in the Quote. Gridline will have no responsibility for any damages or loss that may result from interruption in internet or wireless access, and Gridline shall not refund fees paid to Gridline because Client was unable to use Products
    3. due to lack of Internet or wireless access.
    4. **Internet Protocol and Other Addresses.** Client obtains no proprietary interest in any addresses assigned for its use, and any addresses can be changed at any time by Gridline. To the extent reasonably practical, Gridline will provide you with advance notice prior to changing any address.
    5. **Delivery**. Gridline will act in good faith to promptly ship hardware, but depending on when payment is received, shipment may take up to 5 weeks. Products will be shipped FOB Origin (Gridline's facility or the facilities of any Gridline supplier) to the Client's designated U.S. location, freight prepaid and charged back. Separate charges for shipping and handling will be shown on Client invoice(s). Title and risk of loss or damage to hardware and software media passes to Client when such Products

Doc ID: 20171122144119116
Sertifi Electronic Signature

are delivered to carrier at Gridline's or its supplier's dock (including in the case of Products which are delivered to a supplier's dock for drop shipping to Gridline for Gridline to provide services to such Products, such as kitting, before forwarding to Client for final delivery).  Client acknowledges that Client retains title and risk of loss or damage for any Products or other hardware that Client provides, directly or indirectly, to Gridline in connection with Gridline providing services.  Notwithstanding the foregoing, title to software remains with the applicable licensor(s), and Client's rights are contained in the License.  Shipping instructions and other pertinent delivery information must be included in any Quote issued in accordance with this Agreement.   Product availability is subject to change without notice.  Gridline will act in good faith to meet requested delivery times but is not responsible for delays caused by acts beyond its reasonable control, including without limitation, any failure of the transportation carrier to meet the delivery schedule.  Client must notify Gridline of order discrepancies or damaged Products no later than 5 days after receipt by Client.  All Product received will be deemed accepted if not rejected and returned by Client in accordance with the manufacturer's or publisher's return policy or 30 days after receipt, whichever is sooner.

6. **Installation Hardware in Vehicles.**  Unless Client has purchased from Gridline resold third-party installation services, Client will promptly perform installations of hardware in vehicles according to the most current version of the applicable installation guide specific to the hardware purchased and any other installation instructions provided by Gridline.  Client will promptly verify and report to Gridline the success of each vehicle installation.
7. **Limitation on Use**.  Products offered by Gridline are not designed for use: (A) in situations where failure of same may result in a risk of property damage, death or personal injury; (B) in situations which require fail-safe controls or fail-proof delivery of information, including without limitation any operations involving radioactive or hazardous materials; or (C) with life support, life sustaining, munitions, weapons, nuclear or other applications in which failure of such Products could reasonably be expected to result in personal injury, loss of life or catastrophic property damage.  Use in any such applications is a breach of this Agreement and at Client's sole risk, and Client shall be solely responsible and liable for any and all claims and damages (including, but not limited to reasonable attorney fees and costs of defense) incurred by Gridline as a result of or in connection with such unauthorized use by Client, its employees or agents.

5. **Warranties**.

    1. **Limited Warranty**.  Gridline represents and warrants that:

        1. It has the full power and authority to enter into this Agreement.
        2. The Managed Services will be performed in a professional and workmanlike manner.
        3. When title to hardware Product passes to Client, it will be free and clear of all liens and encumbrances.

    2. **Warranty Disclaimer**.  THE EXPRESS WARRANTIES IN SECTION 5.1 ARE IN LIEU OF, AND GRIDLINE EXPRESSLY DISCLAIMS, ALL OTHER WARRANTIES IN RELATION TO THE PRODUCTS, MANAGED SERVICES OR ANY OTHER SERVICES OR ITEMS PROVIDED BY GRIDLINE HEREUNDER, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OR CONDITION OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, TITLE, SATISFACTORY QUALITY, OR ARISING FROM A COURSE OF DEALING, LAW, USAGE, OR TRADE PRACTICE.  except as expressly warranted in section 5.1.3, the PRODUCTS are provided ON AN "AS IS" BASIS WITHOUT any WARRANTIes OF ANY KIND by GRIDLINE, EITHER EXPRESS OR IMPLIED.  Client understands and agrees that Gridline is not the manufacturer of hardware or publisher of software Products offered under this Agreement.  Grideline's role under this Agreement is solely that of a reseller of Products.  As such, Gridline shall pass through to Client, to the extent available, any supplier written warranties associated with the Products purchased from Gridline.
6. **Nature of Relationship**.  The Parties are and shall be independent contractors to one another.  This Agreement does not and is not intended to create an agency, joint venture or partnership between the Parties.  Neither Party may make any commitments for or create any obligations on behalf of the other Party without that Party's prior written consent.
7. **Confidentiality**. All proprietary, non-public information in any form which Client owns or discloses or which is disclosed or made available on behalf of Client to Gridline, including the existence of this Agreement ("Confidential Information"), is deemed to be confidential or proprietary. Gridline shall use commercially reasonable efforts to maintain Confidential Information in strict confidence, and not disclose Confidential Information to any third party or use any Confidential Information for any purpose other than the performance of this Agreement (on a strict need to know basis) without Client's prior written consent.   Confidential Information shall not include information that (a) is or becomes publicly available through no act or omission by the Gridline; (b) was already in Gridline's possession without restriction before receipt from the Client and was not subject to a duty of confidentiality; (c) is rightfully disclosed to Gridline by a third party without confidentiality restrictions; or (d) that Gridline independently developed without use of or reference to Confidential Information.  Gridline may disclose the Confidential Information as required by law or court order provided: (i) Gridline reasonably notifies the Client in writing of the requirement for disclosure, unless notice is prohibited by law; and (ii) discloses only that portion of the Confidential Information as is legally required. Any such disclosure of Confidential Information shall not otherwise relieve Gridline of any of its obligations under this Section 7.
8. **Indemnification**.  Client hereby agrees to indemnify, defend and hold Gridline, its director, officers, members, employees and agents harmless from any and all third-party claims, actions suits, proceedings, costs, expenses, damages and liabilities, including reasonable attorney's fees and costs, related to Client's use of the Products in violation of this Agreement, the applicable end user agreement or any ordinances, codes, standards, laws, rules, regulations or orders of any government authority.
9. **Limitation of Liability**.

    1. **Exclusion of Indirect Damages.**  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING WITHOUT LIMITATION LOSS OF INCOME, PROFITS, DATA, OPERATIONAL EFFICIENCY, USE OR

Doc ID: 20171122144119116
Sertifi Electronic Signature

INFORMATION) ARISING UNDER THIS AGREEMENT REGARDLESS OF THE FORM OF ACTION OR THEORY OF RELIEF, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

   2. **Maximum Liability.** THE TOTAL AGGREGATE AMOUNT OF DIRECT DAMAGES RECOVERABLE FROM A PARTY UNDER THIS AGREEMENT IS LIMITED TO THE TOTAL AMOUNT PAID OR TO BE PAID BY CLIENT FOR THE PRODUCT PURCHASED UNDER THIS AGREEMENT GIVING RISE TO THE CLAIM, OR THE TOTAL AMOUNT PAID OR TO BE PAID BY CLIENT FOR THE MANAGED SERVICES DURING THE TWO-MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH LIABILITY, WHICHEVER THE CASE MAY BE.
   3. **Exclusions and Application.** The preceding exclusions and limitations of liability shall not apply to: (1) payment of amounts due to Gridline, or (2) indemnity obligations set forth in the section entitled "Indemnification". In addition, no action regardless of form, arising out of the transactions under this Agreement, may be brought by either Party more than one year after the damage, loss or expense occurred.

10. **Termination**.
    1. **For Cause**. Without prejudice to other rights or remedies, either Party may terminate this Agreement immediately if the other Party breaches any of the material terms or conditions of this Agreement and such breach remains unremedied for 30 days after receipt of the written notice of such breach. Further, either Party may terminate this Agreement effective upon notice, if the other Party: (i) becomes insolvent; (ii) enters bankruptcy, reorganization, or other similar proceedings under applicable laws, whether voluntary or involuntary; (iii) admits in writing its inability to pay debts; or (iv) makes or attempts to make an assignment for the benefit of creditors.
    2. **Effect**. Provided such termination is not due to default for non-payment, termination of this Agreement shall not affect outstanding Quotes entered into prior to the effective date of such termination. For all such Quotes, the monthly recurring charges set forth therein for any third party software and its related maintenance and support, and/or third party branded services shall remain in effect until expiration of the then-current Subscription Term. Termination does not relieve Client's duty to pay undisputed amounts for Products already shipped, specially ordered, discontinued or otherwise not subject to return; or fees or expenses incurred, in accordance with this Agreement.

11. **Miscellaneous**.
    1. **Entire Agreement**. This Agreement, together with the Quote Form to which it is attached forms the entire agreement between the Parties relating to the Products to be provided by Gridline to Client and supersedes any prior representations or agreements, oral or written, and all other communications between the Parties relating to the subject matter of this Agreement. For the avoidance of any doubt, any Product or Gridline Product specific legal terms attached to the Quote (including any Licenses, Access Terms or the Gridline Terms of Use) are solely between the Client and the party named in such Product or Gridline Product specific legal terms and such are not part of this Agreement.
    2. **Governing Law; Venue**. This Agreement will be governed by the substantive laws of the state of Arizona without giving effect to any choice of law rules. The United Nations Convention on Contracts for the International Sale of Goods will not apply to this Agreement. The Parties consent to the exclusive jurisdiction of, and venue in, the state and federal courts of Maricopa County, Arizona.
    3. **Assignment**. Client may not assign this Agreement without the prior written approval of Gridline. Any purported assignment in violation of this Section shall be void. Gridline reserves the right to provide some or all of the goods and services offered hereunder from locations, and/or through use of third party providers, located worldwide.
    4. **Notices**. Notices regarding this Agreement to either party shall be in writing and sent by first class mail or overnight courier, addressed to such party at the address provided in the Quote (unless a party provides the other party notice pursuant to this Section to use a different address).
    5. **Force Majeure.** Except for Client's obligation to pay, neither party will be responsible for failure of performance due to causes beyond its control. Such causes include (without limitation) accidents, acts of God, labor disputes, actions of any government agency, shortage of materials, espionage, civil unrest, acts of terrorism, or the stability or availability of the Internet or a portion thereof.
    6. **General**. Any subsequent additions, deletions or modifications to this Agreement are not binding unless agreed upon in writing by authorized representatives of both Parties. If any part of this Agreement is for any reason found to be invalid, illegal or unenforceable, all other parts will still remain in effect. A delay or failure to exercise or partially exercise any right under this Agreement does not operate as a waiver, nor will it preclude future exercise of that right or permit, or sanction any subsequent breach of any term or condition. The provisions of this Agreement, which by sense and content are intended to survive, including but not limited to the sections related to payment, warranties, remedies, indemnification, and limits of liability, will survive the expiration or termination of this Agreement. The headings in this Agreement are for reference purposes only and may not be construed as being part of this Agreement. This Agreement may be executed in one or more counterparts, each of which will be considered an original, but which altogether constitute the same instrument. Agreement to, and acceptance of, this Agreement may be made by facsimile signature or in an electronic form showing the signatures of both Parties on the Quote to which this Agreement is attached.

**GEOTAB END USER AGREEMENT**

https://my.geotab.com/eula.html

Doc ID: 20171122144119116
Sertifi Electronic Signature

| | | | |
|---|---|---|---|
| **Signature:** | *Baruch Guzelgul*<br>pinchas@monseyone.com | **Effective Date:** | **11/29/2017** |
| **Name (Print):** | **Baruch Guzelgul** | **Title:** | **president** |

<div style="background-color:orange; text-align:center;">THANK YOU FOR YOUR BUSINESS!</div>